CENTRAL ILLINOIS PUBLIC SERVICE COMPANY, Petitioner, v. THE POLLUTION CONTROL BOARD, Respondent.

Fourth District   No. 4—85—0602

Opinion filed March 31, 1986.—Rehearing denied April 23, 1986.

T. Kent Cochran, of Sorling, Northrup, Hanna, Cullen & Cochran, of Springfield, for Petitioner.

Neil F. Hartigan, Attorney General, of Springfield (Roma Jones Stewart, Solicitor General, and James L. Morgan, Assistant Attorney General, of Chicago, of counsel), for Respondent.

JUSTICE WEBBER delivered the opinion of the court:

Central Illinois Public Service Company (CIPS) filed a petition with the Pollution Control Board (Board) requesting that the Board establish site specific water qualify standards for a body of water at CIPS's Hutsonville Power Station (power station) site. Following a hearing, the Board denied the petition. CIPS has filed a direct appeal to this court. The facts follow.

CIPS owns and operates the power station located in rural Crawford County along the banks of the Wabash River. The power station has been in service since 1940. It consists of two coal-fired units.

An unlined pond was constructed at the power station in 1968. In 1971 the power station was equipped with electrostatic precipitators to remove fly ash from the flue gases. Fly ash and other wastes are sluiced to the pond. Most of the fly ash settles in the pond and the remaining water and fly ash are discharged into the Wabash River.

Because the storage capacity of the pond is rapidly being depleted, CIPS sought other means of storing the fly ash or of disposing of it. CIPS determined that the construction of a new unlined pond at the power station site would be the most cost effective means of dis-

posing of fly ash. After discussing the plan with the Illinois Environmental Protection Agency (Agency) and installing a system of groundwater monitoring wells to monitor the flow and groundwater impact of the existing fly ash pond and the proposed fly ash pond, CIPS filed an application with the agency seeking a permit to construct a new pond. The Agency denied the permit, noting that certain contaminant levels in the existing pond exceeded limits allowed by the Environmental Protection Act (Act) (Ill. Rev. Stat. 1983, ch. 111½, par. 1001 et seq.). On review, the Board affirmed the Agency's decision.

In order to obtain relief from water quality standards promulgated by the Board, CIPS filed a petition on December 14, 1984, requesting that the Board establish site specific water quality standards for manganese, boron, total dissolved solids, and sulfates in the groundwater at the power station site. A public hearing was held at which CIPS presented evidence concerning the environmental impact of the proposed site specific water quality standards, the economic feasibility of constructing a new fly ash pond, and the environmental impact and economic feasibility of other alternatives. The following is a brief discussion of the evidence presented at the hearing.

Presently the only use being made of the groundwater and the power station site is the industrial use by CIPS. After the closure of the power station, several factors make the area unlikely to be used for a public water supply or for domestic, commercial, industrial, agricultural, recreational, or other legitimate uses. Also following the closure of the power station (which is expected to be in 20 years), it would take from 25 to 150 years for the environmental impact of the existing pond to dissipate.

Evidence was also presented that high levels of sulfates and boron may cause temporary gastro-intestinal irritation in some persons. Also, high levels of total dissolved solids could create a laxative effect, and high levels of total dissolved solids and boron could cause swelling in some individuals. High levels of sulfate may cause gastro-intestinal problems in livestock and may make water unsuitable for use with crops.

CIPS presented evidence showing that the southerly flow of groundwater from the proposed pond would extend less than 100 feet before turning and joining the general flow into the Wabash River. The construction of the proposed pond would be at least 150 feet from the south border of CIPS's property. CIPS also presented groundwater monitoring data, including data taken from a monitoring well near CIPS's south border.

The total cost of construction of an unlined fly ash pond ranges

from almost $2 million to a little over $3.2 million, depending upon where the fly ash is disposed of. Other alternatives would range in cost from nearly $2.2 million to a little over $6.4 million.

The Agency filed a public comment. CIPS and the Agency had done extensive work together studying and preparing the proposed standards. In the public comment, the Agency discussed concerns and proposed solutions. The Agency agreed with CIPS that the higher cost of the alternatives is not justified. After making a few changes or clarifications, the Agency recommended adoption of the proposed standards as modified. CIPS acquiesced in the modifications. CIPS also presented evidence showing that the proposed standards would not violate guidelines set forth by other expert agencies, including the United States Environmental Protection Agency, the Illinois State Water Plan Task Force, and the Illinois Department of Public Health.

Following the hearing, the Board denied CIPS's request for site specific water quality standards.

The Board rejected CIPS's argument that all groundwater in the area is either confined to CIPS's property or flows to the Wabash River. The Board concluded that groundwater monitoring data supplied by CIPS shows that CIPS's property near its south border is contaminated and that groundwater flows from the existing pond past the monitoring well located at the south border. The Board noted that CIPS failed to present data which would indicate that the contamination had not flowed beyond the south border.

Noting that future potential uses of CIPS's property and surrounding properties are difficult to assess, the Board stated that the properties have the potential for domestic, agricultural, and industrial use. The Board rejected CIPS's argument that contaminant levels at the site will be insignificant at the time of the power station's closure.

The Board noted the existence of other alternatives which may be more desirable for their ability to lessen the environmental impact of groundwater contamination. The Board stated that simply because an unlined pond is the least expensive option it does not necessarily follow that it is the most reasonable option considering that more expensive options may achieve a significant reduction in groundwater contamination.

■█ ■ For the foregoing reasons, the Board denied CIPS's petition. Pursuant to section 41(a) of the Environmental Protection Act (Ill. Rev. Stat. 1983, ch. 111½, par. 1041(a)), CIPS has filed a direct appeal to this court. The issues raised by the parties on appeal concern the proper standard of review to be applied by this court and whether the Board's decision was in error under that standard.

The Board argues that its decision should not be disturbed unless it is found to be arbitrary, unreasonable, or capricious. CIPS argues that the Board's decision should be reversed if it is found to be against the manifest weight of the evidence. Resolution of which standard is to be applied depends upon whether the Board, in deciding whether to grant or deny a petition for site specific water quality standards, is acting in a quasi-legislative capacity or a quasi-judicial capacity.

In *Monsanto Co. v. Pollution Control Board* (1977), 67 Ill. 2d 276, 367 N.E.2d 684, the Illinois Supreme Court was faced with determining the proper standard of review of conditions attached to a variance granted by the Board. In reviewing conditions attached to a variance granted by the Board, the court applied the arbitrary and capricious standard of review. The court noted that when the Board attaches conditions to a variance, the Board is acting in a quasi-legislative capacity by exercising its rule-making powers. The Board's "focus in on future conduct and its efficacy depends upon agency expertise." (67 Ill. 2d 276, 290, 367 N.E.2d 684, 689.) The court distinguished attaching conditions to a variance from granting or denying a variance. When the Board decides to grant or deny a variance, it is acting in a quasi-judicial capacity, and the manifest weight of the evidence standard is to be applied. (*Monsanto Co. v. Pollution Control Board* (1977), 67 Ill. 2d 276, 367 N.E.2d 684; *Willowbrook Development Corp. v. Pollution Control Board* (1981), 92 Ill. App. 3d 1074, 416 N.E.2d 385; *Armour-Dial, Inc. v. Pollution Control Board* (1978), 60 Ill. App. 3d 64, 376 N.E.2d 411.) In *Environmental Protection Agency v. Pollution Control Board* (1981), 86 Ill. 2d 390, 427 N.E.2d 162, the supreme court noted that in certain situations the Board's acts may involve both quasi-legislative functions and quasi-judicial functions, in which case both standards of review should be applied to the Board's acts.

CIPS argues that the adoption of site specific regulations is designed to account for the unique circumstances of individuals and, therefore, the proceeding is similar to a variance proceeding and the manifest weight of the evidence standard should be applied. While quasi-judicial proceedings are for the purpose of adjudicating disputed facts in particular causes and quasi-legislative proceedings are for the purpose of promulgating policy-type rules or regulations (see *E&E Hauling, Inc. v. Pollution Control Board* (1983), 116 Ill. App. 3d 586, 451 N.E.2d 555), such is not the only distinction between quasi-legislative functions and quasi-judicial functions. The conditions attached to the variance in *Monsanto* were based on the circumstances of the par-

ticular situation, and the supreme court nevertheless applied the arbitrary and capricious standard of review. (See *Environmental Protection Agency v. Pollution Control Board* (1981), 86 Ill. 2d 390, 427 N.E.2d 162.) As the supreme court recognized in *Monsanto*, the distinction may lie in whether the focus of the action is on past or future conduct and whether a particular agency's expertise is required. In the instant case the determination of whether site specific water quality standards should be adopted focuses on the future environmental impact of the proposed regulations. As the Board argues, the decision to grant or deny site specific water quality standards is unlike the decision to grant or deny a variance because the former is of a permanent nature and the latter is of a temporary nature in order to provide an incentive to achieve compliance with the Act. Additionally, Agency expertise is required in the formulation of site specific water quality standards. As will be discussed later, the procedures required for the adoption of site specific water quality standards is similar to the procedures utilized for the adoption of other regulations.

For the foregoing reasons, we have concluded that the Board acts in a quasi-legislative capacity when adopting or refusing to adopt site specific water quality standards. Therefore, the Board's decision is to be upheld on review unless it is found to be arbitrary, unreasonable, or capricious, or otherwise not in accordance with the law. Having determined the appropriate standard of review to be applied, we turn to the issue of whether the Board's decision herein is arbitrary, unreasonable, or capricious. We have concluded further that the Board's decision herein is arbitrary in that the Board denied CIPS's petition without having adopted procedures and standards for making such a determination as required by statute.

Section 28.1 of the Act (Ill. Rev. Stat., 1984 Supp., ch. 111½, par. 1028.1), effective September 9, 1984, provides:

> "*In adopting a regulation of general applicability, the Board may provide for the subsequent determination of an adjusted standard for persons who can justify such an adjustment consistent with subsection (a) of Section 27 of this Act. The regulation of general applicability shall specify the level of justification required of a petitioner to qualify for an adjusted standard.* The rule-making provisions of the Illinois Administrative Procedure Act and Title VII of this Act shall not apply to such subsequent determinations. *The Board shall adopt procedures applicable to such determinations which, at a minimum, shall require a public hearing on the petition, at least 20 days notice of the hearing by advertisement in a newspaper of*

*general circulation in the area likely to be affected, and the is-*
*suance of a Board order and opinion stating the facts and rea-*
*sons leading to the final Board determination.* Such Board or-
ders and opinions shall be maintained for public inspection by
the Clerk of the Board and a listing of all determinations made
pursuant to this Section shall be published in the Environmen-
tal Register at the end of each fiscal year. A final Board deter-
mination made under this Section may be appealed pursuant to
Section 41 of this Act." (Emphasis added.)

Section 27(a) of the Act (Ill. Rev. Stat. 1983, ch. 111½, par. 1027(a))
provides, in relevant part:

"The Board may adopt substantive regulations as described
in Sections 10, 13, 17, 22, 22.4 and 25 of this Act. Any such
regulations may make different provisions as required by cir-
cumstances for different contaminant sources and for different
geographical areas; may apply to sources outside this State
causing, contributing to, or threatening environmental damage
in Illinois; and may make special provisions for alert and abate-
ment standards and procedures respecting occurrences or
emergencies of pollution or on other short-term conditions con-
stituting an acute danger to health or to the environment. In
promulgating regulations under this Act, the Board shall take
into account the existing physical conditions, the character of
the area involved, including the character of surrounding land
uses, zoning classifications, the nature of the existing air qual-
ity, or receiving body of water, as the case may be, and the
technical feasibility and economic reasonableness of measuring
or reducing the particular type of pollution. The generality of
this grant of authority shall only be limited by the specifica-
tions of particular classes of regulations elsewhere in this Act."

The parties have filed a joint post-oral argument memorandum ar-
guing that section 28.1 of the Act does not apply to situations such as
the present. The parties argue that section 28.1 applies only to those
situations in which the Board has promulgated a rule of general appli-
cability which includes a provision allowing for the subsequent deter-
mination of an adjusted or site-specific standard. The parties agree
that only when such a rule has been promulgated does the Board have
to follow the standards and procedures set forth therein.

We interpret section 28.1 differently from the parties. In our
view, the Board is authorized to adopt adjusted standards in only
those situations in which it has specified in the general regulation the
level of justification required of a party seeking adjusted standards.

When levels of justification have not been specified and procedures have not been adopted for the determination of adjusted standards, the Board is not authorized to reject or adopt adjusted standards.

Although section 27(a) provides that certain matters are to be considered by the Board in promulgating regulations under the Act, consideration of these factors may not replace the requirement that specific levels of justification must be specified in the regulations of general applicability. The legislative mandate is clear in requiring specification of levels of justification and adoption of minimum procedures in all determinations regarding adjusted standards for special circumstances or geographic locations.

The general regulations involved in this case do not specify the level of justification required of a party seeking adjusted standards, and, therefore, the Board has failed to comply with section 28.1. During oral argument, CIPS stated that the Board and the Agency were engaged in formulating rules and regulations to govern the adoption of site specific regulations, but the project was abandoned. CIPS's petition was filed after the effective date of section 28.1, and the adoption or rejection of adjusted standards after that date must be consistent with section 28.1.

This case illustrates the danger of the Board's consideration of a petition for adjusted standards without having first adopted standards to be considered in making that decision. Even though CIPS presented strong evidence that the possible adverse environmental effects of adopting the adjusted standards were greatly exceeded by the costs of other alternatives, the Board denied CIPS's petition. In denying the petition, the Board gave little, if any, consideration to the Agency's findings and recommendations. The Board's decision focused on the remote, yet possible, harm that could result from the adoption of the proposed site specific water quality standards. Such a focus is inconsistent with the Act's purpose in preventing "water pollution," defined as such alteration of the properties of waters of the State or such discharge of any contaminant into the waters of the State which will or is likely to create a nuisance or to render the waters harmful to the public or to the environment. (See Ill. Rev. Stat. 1983, ch. 111½, pars. 1003(a), 1011.) Without the specification of levels of justification as required by section 28.1, CIPS was unable to ascertain the burden of proof required of it in order to obtain site specific relief. Further, without specification of levels of justification as required by section 28.1, the Board was able to deny CIPS's petition for reasons inconsistent with the spirit and purposes of the Act.

▮▮▮ The Board's failure to specify levels of justification and to

adopt procedures for determining adjusted standards as required by section 28.1 of the Act renders the Board's decision herein arbitrary and unreasonable. An administrative agency must comply with the procedures and rules promulgated by the legislature in order to give validity to the agency's finding and orders. (*Ragano v. Illinois Civil Service Com.* (1980), 80 Ill. App. 3d 523, 400 N.E.2d 97.) The adoption or rejection of rules and regulations in contradiction of the law must be viewed as an arbitrary and unreasonable exercise of an agency's authority. (See *Commonwealth Edison Co. v. Pollution Control Board* (1974), 25 Ill. App. 3d 271, 323 N.E.2d 84, *aff'd in part, rev'd in part* (1976), 62 Ill. 2d 494, 343 N.E.2d 459.) Therefore, the Board's order herein is reversed. The cause is remanded for further consideration following the specification of levels of justification and the adoption of minimum procedures as required by section 28.1 of the Act.

Reversed and remanded.

McCULLOUGH, P.J., and MORTHLAND, J., concur.