(Nos. 63577, 63583 cons.—

CENTRAL ILLINOIS PUBLIC SERVICE COMPANY, Appellant and Appellee, v. THE POLLUTION CONTROL BOARD, Appellee and Appellant.

*Opinion filed April 2, 1987.*

Sorling, Northrup, Hanna, Cullen and Cochran, Ltd., of Springfield (T. Kent Cochran, of counsel), for appellant and appellee Central Illinois Public Service Company.

Neil F. Hartigan, Attorney General, of Springfield (Roma J. Stewart, Solicitor General, of Chicago, and James L. Morgan, Assistant Attorney General, of counsel), for appellee and appellant Pollution Control Board.

Eugene H. Bernstein, Alan P. Bielawski and James F. Musso, of Isham, Lincoln & Beale, of Chicago, for *amicus curiae* Illinois American Water Company.

Jeffrey C. Fort and Daniel F. O'Connell, of Martin, Craig, Chester & Sonnenschein, of Chicago, for *amicus curiae* Illinois Environmental Regulatory Group, Inc.

JUSTICE MORAN delivered the opinion of the court:

Central Illinois Public Service Company (CIPS) filed a petition pursuant to section 28 of the Environmental Protection Act (Ill. Rev. Stat. 1983, ch. 111½, par.

1028), requesting that the Illinois Pollution Control Board (the Board) establish site-specific water-quality standards for groundwater at the site of CIPS' Hutsonville power plant. The Board denied the petition. On appeal the appellate court held that the Board was required to establish standards and procedures under section 28.1 of the Environmental Protection Act (Ill. Rev. Stat. 1985, ch. 111½, par. 1028.1) before it could consider a petition for site-specific regulations. (See *Central Illinois Public Service Co. v. Pollution Control Board* (1986), 142 Ill. App. 3d 43, 49-50.) The court held that it was arbitrary and capricious to deny the petition without first adopting standards and procedures under section 28.1 and remanded the matter to the Board with directions to promulgate the necessary standards and procedures. 142 Ill. App. 3d 43, 50-51.

Both CIPS and the Board sought leave to appeal to this court. Each contended that the appellate court had erred in requiring the adoption of standards and procedures under section 28.1 as a prerequisite to the consideration of a petition for site-specific regulations. CIPS additionally contended that the Board should be reversed and the petition granted. The Board, on the other hand, contended that the appellate court should have affirmed the Board's denial of the petition. The Illinois Environmental Regulatory Group, Inc., as *amicus curiae*, filed a statement in support of both petitions, arguing that section 28.1 rulemaking should not be required.

This court granted both petitions for leave to appeal, and the cases were consolidated. Another *amicus*, the Illinois American Water Company, was allowed to file briefs supporting the parties' position that section 28.1 rulemaking was not required.

Both appeals raise the same two issues: (1) Does the Environmental Protection Act (the Act) require the promulgation of standards and procedures under section

28.1 as a prerequisite to the consideration of a petition for site-specific standards? and (2) If it was proper for the Board to consider CIPS' petition, was the Board's denial of the petition arbitrary and capricious?

In 1968 CIPS constructed an unlined pond on the site of the Hutsonville power station, to be used for the disposal of fly ash and other wastes from the two coal-fired units at the station. Fly ash at the station is collected from the smokestacks by means of electrostatic precipitators. The collected ash and other wastes are then sluiced to the pond, where most of them settle to the bottom. The remaining water and unsettled wastes are discharged into the Wabash River.

By 1984 the storage capacity of the unlined pond had been nearly depleted. CIPS petitioned the Illinois Environmental Protection Agency (the Agency) for a permit to construct a second unlined pond adjacent to the first pond. The Agency denied the permit, noting that monitoring wells revealed that the maximum permitted levels for various water contaminants had already been exceeded. CIPS appealed to the Board, which affirmed the Agency's decision. CIPS then filed a petition with the Board seeking site-specific water-quality standards which would allow it to exceed the maximum contaminant levels permitted in the general standards promulgated by the Board. The Agency recommended to the Board that the petition be granted. The Board, however, denied the petition.

CIPS appealed the Board's action directly to the appellate court pursuant to section 41(a) of the Environmental Protection Act (Ill. Rev. Stat. 1983, ch. 111½, par. 1041(a)). The appellate court reversed and remanded, finding that it was arbitrary and capricious to deny CIPS' petition without first promulgating standards under section 28.1, which at the time of the appellate court's opinion read as follows:

"In adopting a regulation of general applicability, the Board may provide for the subsequent determination of an adjusted standard for persons who can justify such an adjustment consistent with subsection (a) of Section 27 of this Act. The regulation of general applicability shall specify the level of justification required of a petitioner to qualify for an adjusted standard. The rule-making provisions of the Illinois Administrative Procedure Act and Title VII of this Act shall not apply to such subsequent determinations. The Board shall adopt procedures applicable to such determinations which, at a minimum, shall require a public hearing on the petition, at least 20 days notice of the hearing by advertisement in a newspaper of general circulation in the area likely to be affected, and the issuance of a Board order and opinion stating the facts and reasons leading to the final Board determination. Such Board orders and opinions shall be maintained for public inspection by the Clerk of the Board and a listing of all determinations made pursuant to this Section shall be published in the Illinois Register and the Environmental Register at the end of each fiscal year. A final Board determination made under this Section may be appealed pursuant to Section 41 of this Act." (Ill. Rev. Stat. 1985, ch. 111½, par. 1028.1.)

The appellate court ruled that "the Board is authorized to adopt adjusted standards in only those situations in which it has specified in the general regulation the level of justification required of a party seeking adjusted standards. When levels of justification have not been specified and procedures have not been adopted for the determination of adjusted standards, the Board is not authorized to reject or adopt adjusted standards." (142 Ill. App. 3d 43, 49-50). The appellate court then remanded the petition to the Board with instructions to promulgate standards and procedures for site-specific relief from water-quality standards pursuant to section 28.1.

The appellate court's ruling appears to be at odds with the plain language of the Environmental Protection Act. The appellate court would require the Board to promulgate procedures and levels of justification any time a party proposes a site-specific modification to a regulation of general applicability. However, section 28.1 states that "the Board *may* provide for the subsequent determination of an adjusted standard" pursuant to section 28.1 (emphasis added), implying that the decision whether to adopt procedures and levels of justification under section 28.1 is discretionary with the Board. Moreover, another section of the Act, section 27, specifically allows the Board to adopt regulations which "may make different provisions as required by circumstances for different contaminant sources and for different geographical areas" (Ill. Rev. Stat. 1983, ch. 111½, par. 1027), and in fact requires the Board, when promulgating such regulations, to take into consideration "the existing physical conditions, the character of the area involved, including the character of surrounding land uses, zoning classifications, the nature of the existing air quality, or receiving body of water, as the case may be, and the technical feasibility and economic reasonableness of measuring or reducing the particular type of pollution" (Ill. Rev. Stat. 1983, ch. 111½, par. 1027).

All rules adopted pursuant to section 27, even site-specific rules, must be adopted pursuant to a detailed procedure, including specific consideration of the economic impact of the regulation (Ill. Rev. Stat. 1983, ch. 111½, par. 1027), publication, hearings, and stenographic transcription of testimony (Ill. Rev. Stat. 1983, ch. 111½, par. 1028). Section 28.1, on the other hand, allows the Board an alternative method of adopting site-specific modifications to general rules. Adjusted standards may be adopted under section 28.1 without all of the procedural steps required for the adoption of general

regulations, so long as the original regulation of general applicability, adopted pursuant to the full rulemaking procedures, specifies the procedures and levels of justification which will entitle a petitioner to an adjusted standard.

Before the adoption of section 28.1 the Board believed it had the power to adopt site-specific regulations, and had done so on numerous occasions. (See, *e.g., In re Petition of the Galesburg Sanitary District to Amend Regulations* (1983), 52 Ill. P.C.B. Op. 299; *In re Proposed Water Quality Standard for Wood River* (1982), 49 Ill. P.C.B. Op. 307; *In re Proposed Amendments to Rule 203.1 of the Water Pollution Regulations* (1978), 29 Ill. P.C.B. Op. 395.) Courts will give substantial deference to the interpretation of a statute by the agency charged with its administration and enforcement (*Illinois Consolidated Telephone Co. v. Illinois Commerce Com.* (1983), 95 Ill. 2d 142, 152), particularly where the administrative interpretation has been long standing (95 Ill. 2d 142, 153). The Board has always interpreted the language in section 27 as a grant of authority to adopt site-specific standards, and we find this interpretation to be well founded. There is nothing in section 28.1 to suggest that this new section, added in 1984, limits any of this power as previously exercised by the Board.

In addition, the legislative history of section 28.1, while not conclusive, tends to support the Board's interpretation. The impetus for section 28.1 apparently arose as a result of the numerous petitions for site-specific relief filed in response to the Board's Combined Sewer Overflow Standards. In 1982 the Board issued an opinion in which it adopted streamlined procedures whereby site-specific relief could be granted without full rulemaking procedures for each site-specific petition. (See *In re Review of Existing Regulations, Rule 602 of Chapter 3: Water Pollution Combined Sewer Overflow* (1982), 46

Ill. P.C.B. Op. 63.) Therein the Board expressed some doubt as to the statutory authority for such a procedure (46 Ill. P.C.B. Op. 63, 76-77), but concluded that the procedure was authorized so long as the regulation specifying the levels of justification for adjusted standards was itself subject to the full rulemaking procedures. See 46 Ill. P.C.B. Op. 63, 76.

The legislature adopted section 28.1 shortly after the Board's adoption of streamlined procedures for adjustments in the combined sewer overflow regulations. The bill adding section 28.1 served to clarify the statutory authority of the Board to adopt streamlined procedures. The sponsor of the bill, Senator MacDonald, described the bill as providing the Board "with a procedural mechanism by which it can develop alternative standards for uniquely . . . situated pollution sources." (83d Ill. Gen. Assem., Senate Proceedings, May 23, 1984, at 175.) This history indicates that the legislature believed it was adding to the Board's existing powers; there is nothing to indicate that the legislation was intended to limit the power, previously exercised by the Board, to adopt site-specific regulations pursuant to section 27.

A further indication as to the meaning of section 28.1 can be found in a legislative amendment enacted shortly after the issuance of the appellate opinion in this case. Public Act 84—1221, effective July 18, 1986, amends section 28.1 to make it clear that that section does not limit the power to adopt site-specific regulations pursuant to sections 27 and 28: .

> "This Section shall not be construed so as to affect or limit the authority of the Board to adopt, amend or repeal regulations specific to individual persons, geographic areas or sites pursuant to Sections 27 and 28 of this Act, or so as to affect or impair the validity of any such existing regulations."

Subsequent enactments may be used to help determine the legislature's original intent (*In re Marriage of Semmler* (1985), 107 Ill. 2d 130, 137), particularly where the amendment is enacted shortly after the interpretation of the statute it amends comes into dispute (*People v. Rink* (1983), 97 Ill. 2d 533, 540-41). This amendment is additional evidence that the legislature did not intend to do away with site-specific rulemaking pursuant to section 27 when it originally enacted section 28.1.

For the foregoing reasons we conclude that the Board may adopt site-specific regulations pursuant to section 27 without adopting procedures and standards of justification pursuant to section 28.1.

Having decided that the Board did not exceed its authority in considering CIPS' petition, we must also decide whether the Board erred in denying the petition. At oral argument CIPS' attorney informed the court that CIPS no longer wanted to build an unlined pond at the site and had instead completed construction on a lined pond (presumably pursuant to a permit issued by the Agency). However, the petition currently before us does not directly involve the proposed pond but instead seeks to relieve CIPS of the duty of complying with the statewide limits for water contamination. Since CIPS' own monitoring wells show that the existing pond has already caused excess contamination, the issue is far from moot.

The present appeal involves the Board's powers under section 13 of the Environmental Protection Act (Ill. Rev. Stat. 1983, ch. 111½, par. 1013), which empowers the Board to adopt water-quality standards. The determination of standards by the Board is a quasi-legislative act (*Environmental Protection Agency v. Pollution Control Board* (1981), 86 Ill. 2d 390, 400), and therefore a reviewing court may overturn the Board's determination only if it is arbitrary and capricious (*Environmental Pro-*

*tection Agency v. Pollution Control Board* (1981), 86 Ill. 2d 390, 401-02; *Monsanto Co. v. Pollution Control Board* (1977), 67 Ill. 2d 276, 289).

CIPS' petition requests modified standards for four groundwater contaminants: manganese, total dissolved solids, boron, and sulfate. While there are no specific standards for groundwater, groundwater is subject to existing general water quality standards which vary depending on the use or potential use of the water involved. CIPS proposes that it be allowed site-specific standards for the four contaminants in excess of any of the existing standards. CIPS agrees that, at the proposed levels, use of the contaminated water for drinking or irrigation might have deleterious effects, ranging from temporary stomach discomfort in humans to agricultural crop damage. CIPS' consultant was not sure how long contamination would persist but estimated that the water would remain contaminated for a period of 45 to 170 years from the present.

Although agreeing that the proposed contamination levels will render the groundwater involved unsuitable for some purposes, CIPS argues that the groundwater will nonetheless not be polluted when judged by the Act's definition of "water pollution," which reads as follows:

" 'Water Pollution' is such alteration of the physical, thermal, chemical, biological or radioactive properties of any waters of the State, or such discharge of any contaminant into any waters of the State, as will or is likely to create a nuisance or render such waters harmful or detrimental or injurious to public health, safety or welfare, or to domestic, commercial, industrial, agricultural, recreational, or other legitimate uses, or to livestock, wild animals, birds, fish, or other aquatic life." Ill. Rev. Stat. 1983, ch. 111½, par. 1003(nn).

CIPS presents several arguments in support of its position. First CIPS argues that under the statutory definition no pollution has occurred unless actual harm to humans or crops will occur as a result of the contamination, and that thus there is no pollution if any harmful effects can be avoided by not using the water. In addition, tracking the language of general guidelines published by the United States Environmental Protection Agency, CIPS argues that an adjusted standard should be granted because it has allegedly established that (1) the groundwater involved is located in close proximity to a large body of water, in this case the Wabash River; (2) the groundwater flows into the Wabash; (3) CIPS owns all of the property through which the groundwater flows; and (4) the contaminated groundwater will have no impact on the water quality of the Wabash. Finally, CIPS has attempted to establish that there will not likely be a need for this particular water in the foreseeable future, and argues that an adjusted standard is thus warranted.

The Board, at the outset, disagrees with CIPS' interpretation of the definition of water pollution in the Act. The Board argues that the Act treats water as a resource, and that pollution occurs whenever contamination is likely to render water unusable. Under the Board's interpretation there is no need to show that actual harm *will* occur, only that harm *would* occur if the contaminated water were to be used. Since the Board is charged with administering the Environmental Protection Act, its interpretation of the statute is entitled to deference. (*Massa v. Department of Registration & Education* (1987), 116 Ill. 2d 376; *Illinois Consolidated Telephone Co. v. Illinois Commerce Com.* (1983), 95 Ill. 2d 142, 152.) Under the Board's view any contamination which prevents the State's water resources from being

usable would constitute pollution, thus allowing the Board to protect those resources from unnecessary diminishment. CIPS' interpretation, on the other hand, would mean that water rendered unusable would not be considered polluted so long as use of the water ceased subsequent to contamination. We find the Board's interpretation preferable to CIPS' interpretation, especially considering the deference we must accord to the Board.

In addition, while not conceding that the United States Environmental Protection Agency guidelines apply to the Illinois statute, the Board found that even under these guidelines CIPS has failed to prove its eligibility for an adjusted standard. CIPS' data as to groundwater flow was derived from samples taken from several monitoring wells placed on CIPS' property. The Board agrees that the water-table levels in the wells demonstrate a general flow in the direction of the Wabash. However, the Board's opinion concluded that "[w]hile CIPS' assertion that the general groundwater discharge in the area of question is into the Wabash River is indeed the most simple and logical explanation, the record supports neither that all of the groundwater does so discharge, nor that the discharge is all directly to the Wabash River." The Board notes, for instance, that there are many examples of groundwater flow completely under a large body of water, and finds that CIPS, by failing to monitor beyond the boundaries of its own property, has failed to provide data with which to prove or disprove this contingency.

Moreover, CIPS' own study admits that there is "radial" flow around the existing pond, i.e. the presence of the pond below water-table levels disrupts the normal direction of groundwater flow and causes a flow outward from the pond in all directions. CIPS asserts that the "radial" flow around both the old and new ponds will not extend more than 100 feet from the ponds, and thus

will be confined within CIPS' property line, which is at least 150 feet from the ponds at the closest point. The Board's opinion notes, however, that the 100-foot figure was based upon values for the hydraulic conductivity of the soil which CIPS' report "represented as fact when they are, in reality, rough estimates." At the Board's hearing, in fact, CIPS' own expert admitted that the 100-foot figure was an estimate, and admitted that he did not know for sure how far the radial flow would cause the contaminant plume to extend. The Board's opinion further notes that "CIPS has not provided *any* off-site monitoring data to support the contention of confinement of the contaminant plume to [its] own property" (emphasis in original), and notes that a monitoring well at the south property line shows clear evidence of contamination. According to the Board, "[a] prudent conclusion which could be drawn from this data is that the flow from the current ash pond does extend off the CIPS property toward the south."

The Board also disputes CIPS' contention that the proposed contamination levels would not impact any present or potential uses of the groundwater involved. The Board notes that two deep wells on CIPS' property are currently being used to provide drinking water for the power station employees and boiler makeup for the plant's steam-generation cycle. The deep wells from which this water is taken have already contained evidence of contamination.

The Board also notes that the long period of potential contamination makes prediction of future water needs extremely difficult. The geological makeup of the area makes future use as a water supply desirable, even if, with the exception of CIPS' wells, there is currently no need for water-supply wells in the immediate area. The Board found that it was "difficult to project *** what

land uses might be even 20 years from now, yet alone 170 years from now."

Finally, the Board noted that CIPS, because of the erroneous assumption that contamination would not extend beyond the boundaries of its property, had provided little data as to the effect of contamination on adjacent lands. There is, therefore, no reliable way to assess these effects.

It is not for this court to determine whether the Board's action was wise, or even if it is the most reasonable action based on the record. The Board is made up of technically qualified individuals, and its technical determinations must be upheld unless arbitrary and capricious. (See *Massa v. Department of Registration & Education* (1987), 116 Ill. 2d 376.) As this court stated in *Monsanto Co. v. Pollution Control Board* (1977), 67 Ill. 2d 276, 290, "[t]he Board, unlike this court, is well equipped to determine the degree of danger which a pollutant will cause, and then to balance the public threat against an alleged individual hardship." The Board has concluded in this case that "the information in the record regarding site geology is inadequate to form a basis for granting the requested site-specific standards." Based on the many problems with CIPS' data discussed above we do not believe that the Board's determination is arbitrary and capricious. Therefore we will not overturn that determination.

In sum, we reverse the appellate court's ruling that the Board could not consider CIPS' petition without first promulgating standards under section 28.1. We affirm the Board's decision denying CIPS' petition.

*Appellate court reversed;*
*Pollution Control Board affirmed.*