THE ILLINOIS STATE CHAMBER OF COMMERCE *et al.*, Appellants, v. POLLUTION CONTROL BOARD *et al.*, Appellees.

Second District   No. 2—87—1143

Opinion filed December 29, 1988.

Roy C. Cobb, Jr., of Container Corporation of America, of Chicago, for petitioner Container Corporation of America.

Jeffrey C. Fort, Roy M. Harsch, Daniel F. O'Connell, and Celeste A. Thorne, all of Gardner, Carton & Douglas, of Chicago, for other petitioners.

Neil F. Hartigan, Attorney General, of Springfield, and Dorothy M. Gunn, of Pollution Control Board, of Chicago (Robert J. Ruiz, Solicitor General, Michelle D. Jordan, Michael K. Ohm, and Gerald T. Karr, Assistant Attorneys General, of Chicago, and Mary Drake, Wayne Wiemerslage, and Susan J. Schroeder, of Environmental Protection Agency, of counsel), for respondents.

JUSTICE UNVERZAGT delivered the opinion of the court:

When this case came on for oral argument, counsel for the parties presented this court a "Joint Motion to Stay Proceedings Pending Im-

plementation of Settlement Agreement," alleging that the parties have entered into compliance plans and that they needed until April 1989 to secure their approval from the Pollution Control Board and the Attorney General.

We deem this motion too little and too late. We are always pleased to receive settlement motions at an appropriate time. However, we remind counsel that the date of hearing is an inappropriate time to tender such motions.

■ When the date of hearing is reached, each of the judges of this court has read the parties' complex and extensive briefs, and the record has been checked for key facts and pleadings. In many cases the judges have prepared extensive prehearing memoranda. In the event we were to continue the matter until April 1, 1989, as requested, and the matter were to be heard, a great deal of this preparatory work would have to be redone. This would definitely impact unfavorably in our ability to produce legal decisions without undue delay. We therefore reject the continuance motions. We admonish counsel that their tactics are not favored and are detrimental to the prompt processing of appeals. They will not be condoned. We have, therefore, denied the joint motion to continue. We proceed to the merits.

Pursuant to section 41(a) of the Environmental Protection Act (Ill. Rev. Stat. 1987, ch. 111½, par. 1041(a)) and Supreme Court Rule 335 (107 Ill. 2d R. 335), appellants Illinois State Chamber of Commerce, Jefferson Smurfit Corporation (Smurfit), and Container Corporation of America (Container) seek administrative review of the October 19, 1987, final order of the Pollution Control Board (the Board) amending section 215 of the Illinois Administrative Code (35 Ill. Adm. Code 215 (1985)), regarding emissions of volatile organic materials from flexographic and rotogravure printing facilities. The new regulation subjects flexographic and rotogravure printing operations, with annual volatile organic material usage between 100 and 1,000 tons per year, to new emission limitations. The Board specified that these operations must comply with these emission limitations by December 31, 1987.

In this court, the appellants maintain that the Board failed to consider the proper statutory factors in limiting the exemptions under regulation and that the adoption of a December 31, 1987, compliance deadline was arbitrary, capricious, and unreasonable. The appellants ask this court to vacate the Board's October 29, 1987, final order amending Board Rule 215.245 (35 Ill. Adm. Code 215.245 (1985)), and remand this matter to the Board with directions to adopt a reasonable compliance date and a proper exemption level, taking into consideration factors set forth in section 27(a) of the Environmental Protec-

tion Act (Ill. Rev. Stat. 1987, ch. 111½, par. 1027(a)).

Presented below is a brief review of the background needed to understand the basis of this appeal. Other facts relevant to the issues raised in this petition for administrative review will be included in this disposition where appropriate.

The instant matter came before the Board upon a proposal of the Illinois Environmental Protection Agency (the Agency) to amend certain portions of section 215 of the Illinois Administrative Code (35 Ill. Adm. Code 215 (1985)) pertaining to emissions of volatile organic materials (VOM) from flexographic and rotogravure printing facilities. The origin of this proceeding is rooted in the requirements of the Clean Air Act (CAA) (42 U.S.C. §7401 *et seq.* (1982)). Pursuant to section 109 of the CAA (42 U.S.C. §7409 (1982)), the United States Environmental Protection Agency (USEPA) adopted a national ambient air quality standard (NAAQS) for ozone. Attainment of this NAAQS was to have been demonstrated for all areas of Illinois by December 31, 1982, according to the provisions of section 172(a)(1) of the CAA. (42 U.S.C. §7502(a)(1) (1982).) However, Illinois was unable to make such a demonstration and, therefore, applied for and received an extension of this deadline until December 31, 1987, pursuant to the provisions of section 172(a)(2) of the CAA. (42 U.S.C. §7502(a)(2) (1982).) As a prerequisite to obtaining this extension, Illinois was required in the interim to include in its "State Implementation Plan" (SIP) for areas which are nonattainment for ozone "such reduction in emissions from existing sources in the area as may be obtained through the adoption, at a minimum, of reasonably available control technology." (42 U.S.C. §7502(b)(3) (1982).) "Reasonably available control technology" (RACT) is not defined in the CAA. However, the USEPA promulgated industry specific "control technology guidelines" (CTGs) that are intended to describe RACT for a given industry and assist States in determining RACT. USEPA has published three groups of CTGs.

On December 30, 1982, *In The Matter of RACT II Rules*, R80—5, the Board adopted rules intended to satisfy the RACT requirement as specified in the second group of CTGs, which covered the following source categories: factory surface coating of flatwood panelling, petroleum refinery fugitive emissions, pharmaceutical manufacturing, rubber tire manufacturing, surface coating of miscellaneous metal parts and products, graphic arts (printing), dry cleaning perchloroethylene, leak prevention from gasoline tank trucks and vapor collection systems, and petroleum liquid storage in external floating roof tanks. However, on July 11, 1985, the USEPA proposed to disapprove cer-

tain of the rules adopted by the Board in R80—5. Included in the proposed disapproval were two provisions related to flexographic and rotogravure printing. These provisions were the 1,000-ton-per-year exemption found at section 215.402 of the Illinois Administrative Code (35 Ill. Adm. Code 215.402 (1985)) and the "good engineering design" alternative found at section 215.402(d)(2) (35 Ill. Adm. Code 215.401(d)(2) (1985).

In regulation R85—21 the Agency proposed to reduce the exemption limit provided in section 215.402 to 100 tons per year and to eliminate the "good engineering design" provision of section 215.402(d)(2) with both amendments applicable only in nonattainment areas. The counties designated as nonattainment areas were Cook, Du Page, Kane, Lake, Macoupin, Madison, McHenry, Monroe, St. Clair and Will. The Agency filed its proposal on September 23, 1985. Merit hearings were held on December 12 and 13, 1985, in Springfield, and on March 6 and 7, 1986, in Chicago. At both the December 12 and March 6 hearings the Agency offered amendments to its original proposal.

As originally filed and amended, the Agency's proposal in R85—21 addressed matters in addition to flexographic and rotogravure printing. These matters included amendments to definitions found in section 211.122 of the Illinois Administrative Code (35 Ill. Adm. Code 211.122 (1985)) and to various provisions related to miscellaneous metal parts and products, petroleum liquid storage in external floating roof tanks, and leak prevention from gasoline tank trucks and vapor collection systems. On August 28, 1986, the Board split the docket in R85—21, placing the flexographic and rotogravure printing amendments in docket B and all other provisions of the Agency's proposal in docket A. This action was occasioned by the June 17, 1986, determination of the Department of Energy and Natural Resources (the Department), and the June 20, 1986, concurrence of the Economic and Technical Advisory Committee, that an economic impact study (EcIS) should be prepared for only the flexographic and rotogravure printing amendments. Splitting of the docket thus allowed the Board to proceed with the docket A subject matter while activities associated with the EcIS were being undertaken.

Subsequently, on March 31, 1987, the department filed "the Economic Impact of the Rotogravure and Flexographic Printing Provisions of Proposed Regulation R85—21," the EcIS in the instant matter. EcIS hearings were held on May 4, 1987, in Chicago and on May 20, 1987, in Springfield. A revised and final copy of the EcIS was filed with the Board on July 31, 1987.

Docket B was sent to first notice by Board order of May 25, 1987. Publication occurred at 11 Ill. Reg. 11925 (July 17, 1987). The Board received 31 public comments (PCs) in the overall R85—21 proceeding, including nine filed during the first notice period of docket B which pertained specifically to the subject matter of flexographic and roto- gravure printing. The first two were filings by the Department (PC No. 23) and the Agency (PC No. 24), consisting principally of re- sponses to questions posed at the final EcIS hearing. PC No. 25 through No. 31 consisted of perspectives on the content of the pro- posed rules dealing with flexographic and rotogravure printing. One each of these comments was filed by Printpack, Inc. (PC No. 25), and by the Agency (PC No. 26); the remaining five were filed by Smurfit and its divisions.

Docket B was sent to second notice by Board order of September 4, 1987; there were no changes to the rules as proposed at first no- tice. On October 29, 1987, the Board adopted the proposed amend- ments relating to flexographic and rotogravure printing. In this re- view proceeding, we are concerned only with the amendment pertaining to the annual VOM emission limitations.

■ When an administrative agency such as the Board exercises its rulemaking powers, it is performing a quasi-legislative function, and, therefore, it has no burden to support its conclusions with a given quantum of evidence. (*Illinois State Chamber of Commerce v. Pollution Control Board* (1977), 49 Ill. App. 3d 954, 961; *Shell Oil Co. v. Pollution Control Board* (1976), 37 Ill. App. 3d 264, 270-71; see also *Central Illinois Light Co. v. Pollution Control Board* (1987), 159 Ill. App. 3d 389, 396-97.) The burden of establishing the invalidity of regulations promulgated by the Board is on the appellants, and that burden is very high. (*Chamber of Commerce*, 49 Ill. App. 3d at 960.) Because administrative agencies are inherently more qualified to de- cide technical problems, this court, when reviewing administrative rules and regulations, may not invalidate a regulation unless it is clearly arbitrary, unreasonable or capricious. *Central Illinois Light*, 159 Ill. App. 3d at 397; *Shell Oil*, 37 Ill. App. 3d at 270-71.

Appellants contend that the Board's adoption of a compliance deadline of December 31, 1987, was arbitrary, capricious, and unrea- sonable because compliance with the proposed rule was not technically feasible under such a compliance schedule. Therefore, appellants ar- gue, the regulation is invalid.

The regulation pertinent to this appeal added a new section to subpart H of section 215.245 of the Illinois Administrative Code (35 Ill. Adm. Code 215.245 (1985)). That subpart sets forth special limita-

tions for sources in major urbanized areas which are nonattainment for ozone. The proposed amendment to this subpart provides:

"(a) The limitations of Subpart P shall apply unless the facility's aggregate uncontrolled rotogravure and/or flexographic printing press emissions of volative organic material are limited by operating permit conditions to 90.7 Mg (100 tons) per year or less in the absence of air pollution control equipment or whose actual emissions in the absence of air pollution control equipment would be less than or equal to 90.7 Mg (100 tons) per year when averaged over the preceding three calendar years.

(b) If an owner or operator of a packaging rotogravure printing press proposes to comply with the limitations of Section 215.401 pursuant to subsection (d) of that Section, then the combined capture and control system must provide an overall reduction in volatile organic material emissions of at least 65 percent."

This amendment, pertaining to volatile organic materials (VOM) from flexographic and rotogravure printing facilities, was proposed by the Agency on September 23, 1985, following the USEPA's disapproval of the Agency's previously proposed allowable emissions for these facilities of up to 1,000 tons per year. Following hearings by the Board which spanned a two-year period and the preparation of an economic impact study (EcIS) for the flexographic and rotogravure printing amendments, the Board adopted the new rule on October 29, 1987. According to the Board, the CAA required compliance with the rule, a reasonably available control technology (RACT) rule, by December 31, 1987. Appellants maintain that, given the short time span between the date of adoption of this rule and the compliance deadline, compliance with the rule was technically infeasible and that, therefore, the rule was not promulgated in accordance with section 27(a) of the Environmental Protection Act. Ill. Rev. Stat. 1987, ch. 111½, par. 1027(a) (the Act).

Section 27(a) of the Act directs the Board, in promulgating regulations, to take into account the technical feasibility and economic reasonableness of reducing the particular type of pollution sought to be regulated. Appellants contend that since the proposed rule was not promulgated in accordance with State law, the rule is invalid.

The record reveals that evidence was presented regarding the technical feasibility of the affected sources to comply by the deadline date. Smurfit and Container presented testimony and comments to show that they could utilize neither add-on controls nor water-based

inks within the time allowed for compliance. For example, Smurfit testified that converting to low-VOM inks would require the reformulation of all the inks at its Bedford Park plant and would take at least three and possibly five or more years for the conversion. The appellants' also presented evidence that the implementation of an add-on incinerator system would require time for engineering, bidding, fabrication, shipment, installation, and debugging of the system and that such a system could never be delivered and put into operation by the compliance date.

Additionally, the Agency stated that its "best estimate for the expeditious installation of control equipment for the flexographic and rotogravure category is one year from the enactment of the regulation." However, the Agency in PC No. 26, filed with the Board, alerted the Board to the fact that "any date for compliance beyond December 31, 1987, may jeopardize the approvability of Illinois' ozone SIP and any date for compliance beyond April 1, 1988, may jeopardize the State's ability to attain the ozone standard in 1988 as well as the State's ability to use 1988 data for future attainment demonstration purposes or planning."

The appellees maintain that the evidence showed that the December 31, 1987, deadline was justifiable. According to the Board and the Agency, Dr. John Reed, technical support chief of the air quality planning division of the Agency, testified that many companies had begun implementing plans for compliance before the Board's final order was issued. This contention, however, is clearly misleading because Dr. Reed testified only that, "My impression is that many companies have already been implementing plans for compliance." This "impression" by an Agency employee did not prove that the affected facilities would be able to achieve compliance by December 31, 1987.

■ Based on the preceding evidence, Smurfit and Container argue that the Board should have determined that it was not technically feasible for them to comply by December 31, 1987. Instead, they contend, the Board made no finding at all regarding the technical feasibility of the affected facilities to be in compliance by the deadline date.

It is not this court's role to determine if the manifest weight of the evidence showed that it was technically feasible and economically reasonable for a substantial number of the affected sources to comply with a proposed Board regulation; it is only necessary that the record reflect that these factors were taken into account. (*Shell Oil*, 37 Ill. App. 3d at 272-75.) Although the Board's final order did not make any formal findings with respect to the technical feasibility of compli-

ance, the order, despite appellants' contention to the contrary, does reflect that the Board took this factor into consideration. In particular, the Board, in discussing the compliance date, refers in its final order to PC No. 28, filed by Smurfit, in which Smurfit pointed out the technical difficulty of bringing its facilities into compliance by December 31, 1987. It is apparent from this reference alone that the Board did consider the question of technical feasibility in adopting the proposed regulation. This consideration is all that is required under the provisions of section 27(a) of the Act. Ill. Rev. Stat. 1987, ch. 111½, par. 1027(a).

Section 27(a) and the standards set forth therein reflect a legislative intent to prescribe Board rulemaking to the extent necessary to insure that the Board acts within the boundaries of its delegated authority. (*Shell Oil*, 37 Ill. App. 3d at 274.) The section does not mandate any particular standards that the Board must comply with in adopting its rules nor does it impose specific requirements applicable to the resolution of individual challenges of a regulation, as are presented here. (37 Ill. App. 3d at 274.) We conclude that the Board acted in accordance with the requirements of section 27(a) in adopting the regulation in question.

■ An appropriate resolution of the technical problems Smurfit and Container maintain will result from the Board's adoption of the proposed regulation is provided for in the variance procedure of section 35 of the Act. (Ill. Rev. Stat. 1987, ch. 111½, par. 1035.) That section provides that an individual variance may be granted whenever it is found that compliance with a rule or regulation of the Board would impose an arbitrary or unreasonable hardship. Smurfit and Container maintain that 10 out of the 14 rotogravure and printing facilities to be affected by the enactment of the rule in question filed variances after its enactment and that these filings prove that the December 31, 1987, compliance date was arbitrary and unreasonable. We, however, have no evidence in the record before us of any variance procedures undertaken by the affected facilities and cannot take judicial notice of that fact as appellants request. We also have no proof that Smurfit and Container have filed for variance as appellees claim. Nevertheless, in the instant case where Smurfit and Container seek to relax the enforcement against them of the rule in question, due to arbitrary and unreasonable hardship, the appropriate procedure for them to pursue would be, first, seek a variance, and, then, if the variance was subsequently denied, petition this court for review based on the record at that proceeding. (See *Commonwealth Edison Co. v. Pollution Control Board* (1975), 25 Ill. App. 3d 271, 281, *re-*

*versed in part on other grounds* (1976), 62 Ill. 2d 494.) Smurfit and Container have not complied with this procedure.

■ Appellants also contend that the compliance deadline of December 31, 1987, was invalid because the adoption of that date was based on the Board's mistaken belief that the CAA required all RACT rules, including the one in question, to have a compliance date no later than December 31, 1987. Appellants argue that the Board's belief that it had to comply by December 31 demonstrates that it failed to consider the technical feasibility or economic reasonableness of the proposed rule in setting a compliance date. The Board, in adopting the proposed rule, did take into account the technical feasibility of that rule. Additionally, the Board dealt extensively in its final order with the economic reasonableness of the enactment. Had the Board concluded that the proposed rule was to have a compliance date of December 31, 1987, without any consideration of these factors, appellants' correlation might have some merit. Such is not the case here.

Clearly, the Board did state, as appellants point out, that the "CAA requires that RACT rules, including that proposed here, be in place by December 31, 1987." Section 172 of the CAA (42 U.S.C. §7502 (1982)), which deals with the attainment of national ambient air quality standards for nonattainment areas such as the affected facilities in question, makes it clear that those States which could not attain the national primary air quality standard for photochemical oxidants or carbon monoxide (or both) prior to December 31, 1982 (as was the case here), must provide for the attainment of such standard no later than December 31, 1987. Moreover, comments filed by the USEPA concerning volatile organic compounds (VOC) RACT rulemaking set forth that the USEPA would not approve any VOC compliance date extension past December 31, 1987. Thus, the Board's statement that the RACT rule in question had to be in place by December 31, 1987, was a correct statement of USEPA policy.

Nevertheless, in its final order the Board discussed the fact that Smurfit and Printpack, Inc., had questioned whether compliance was realistic by the December 31 date and that these companies had suggested that the proposed rule allow affected facilities from one to three years after USEPA approval to come into compliance. This suggestion was set forth in public comments filed by both Smurfit and Printpack, Inc. These PCs constitute the same comments which contained a discussion of the technical feasibility and economic reasonableness of the adoption of the proposed rule by December 31, 1987, and which we have already concluded were considered by the Board in adopting the rule. Consequently, we conclude that the fact the

Board stated that a one- to three-year extension did not constitute "a viable option" for compliance did not establish that the Board based its adoption of its rule on the belief that it could not adopt a rule with a compliance extension beyond the CAA December 31, 1987 deadline.

It is not this court's role to determine whether the Board's action was wise, or even if it was the most reasonable based on the record. (*Central Illinois Public Service Co. v. Pollution Control Board* (1987), 116 Ill. 2d 397, 412.) " 'The Board, unlike this court, is well equipped to determine the degree of danger which a pollutant will cause, and then to balance the public threat against an alleged individual hardship.' " (116 Ill. 2d at 412, quoting *Monsanto Co. v. Pollution Control Board* (1977), 67 Ill. 2d 276, 290.) In setting a compliance deadline of December 31, 1987, the Board made such a determination after consideration of the factors set forth in section 27(a) of the Act. (Ill. Rev. Stat. 1987, ch. 111½, par. 1027(a)), as discussed above. We conclude, therefore, that under the facts presented here, the Board's action in adopting the proposed rule was not arbitrary, capricious and unreasonable.

We note that appellants rely on a preliminary notice published by the USEPA in the Federal Register of July 14, 1987, (52 Fed. Reg. 26403 (1987)) as further support of its contention that the Board mistakenly concluded that the CAA required a December 31, 1987, deadline for the rule in question. However, despite appellants' assertion that this USEPA notice was in the record before the Board, we find no evidence of it. Furthermore, although Container advised the Board of this notice in its second notice comments filed with the Board, we note that these comments were filed on October 21, 1987, after the close of the comment period, and, therefore, the USEPA notice could not have been considered by the Board or, subsequently, by us in this review procedure.

■ Appellants next contend that the Board's adoption of a 100-ton exemption level was unreasonable because the Board failed to make an independent decision on the basis of the evidence in the record before it. Instead, the Board based its decision on the exemption level recommended by a USEPA employee in comments filed by the USEPA.

The recommendation to which appellants refer appears in PC No. 9, filed with the Board. PC No. 9 consists of USEPA comments and a cover letter dated July 8, 1986, which is signed by Steve Rothblatt for David Kee, director of the air management division of the USEPA's Region 5. The letter states that the attached comments reflect the USEPA's position on the subjects addressed therein and that the com-

ments supplement the testimony of Steven Rosenthal, who testified at the March 6, 1986, hearing on the proposed rule. Rosenthal, an employee of the USEPA, had devoted the past 3½ years to the VOC control program in Region 5. The pertinent portion of the comments pertaining to flexographic and rotogravure printing states:

"[A]s presented in Steven Rosenthal's testimony, no exemptions greater than 100 tons per year were found in any other states' VOC regulations. Final adoption of any exemption greater than 100 tons per year would be finally disapproved by USEPA."

Contrary to the appellants' protestation in this court that the preceding comments do not reflect the official policy of the USEPA, we are in agreement with the Board, which stated in its final order:

"It is difficult to imagine a more clear policy statement than that enunciated by the USEPA in PC No. 9. Neither can the Board accept that the statement represents an isolated and independent view held only by Mr. Rothblatt, although even that might carry weight given Mr. Rothblatt's position of authority. Rather, the cover letter to PC No. 9 makes it clear that Mr. Rothblatt was conveying the official position of the USEPA, at least through the level of Region V [sic]."

In addition to PC No. 9 discussed by the Board, other evidence appears in the record to provide justification for the 100-ton exemption level. On December 12, 1985, at the first hearing in the instant rulemaking proceeding, Dr. John C. Ting, an environmental protection specialist in the technical support unit of the Agency's air quality planning section of the air pollution control division, presented cost information concerning thermal and catalytic incinerators and other add-on control methodologies for flexographic and rotogravure printing. Dr. Ting's testimony was subsequently updated by Dr. John Reed of the Agency at the May 20, 1987, hearing to reflect the availability of higher efficiency thermal incinerator equipment. Furthermore, USEPA's control technique guidelines (CTG) for flexographic and rotogravure printing, describing various control technologies and the cost effectiveness provided by such technologies, was made part of the record. Additionally, the EcIS commissioned by the Department of Energy and Natural Resources and designed to consider the flexographic and rotogravure printing provisions in question here concluded:

"Except for one case of low concentration VOM input gas to an incinerator with no heat recovery, all cost effectiveness estimates are within the $2,000/ton value used by the USEPA as

an indicator of economic reasonableness. Indirect costs and benefits will be minor and will tend to counterbalance each other. Overall, it appears that the cost of the proposed regulation will be of the same magnitude as the benefits."

That the Board considered this evidence in adopting the proposed rule is apparent from its discussion in its order of the technical and economic information offered by Container and Smurfit at the final EcIS hearing. The Board stated:

"A witness representing Jefferson Smurfit indicated that compliance costs for his facility would lie between $3,031 and $4,074 per ton, depending upon the option selected. However, the Agency has independently calculated Jefferson Smurfit's costs for the same compliance options to be between $849 and $1,059 per ton per year (PC No. 26 at 3 and attachment 4). The Board notes that Jefferson Smurfit's estimates are based on first-year costs, and do not consider annualization of the capital costs over the operating life of the equipment. Since capital costs constitute a large fraction of the first-year costs, it is to be expected that Jefferson Smurfit's cost per ton figures will be significantly lower when the capital costs are distributed over the operating life of the equipment, as the Agency has done.

Jefferson Smurfit Corporation also contends that all of the cost per ton figures are inflated because, in its perspective, the Agency's estimate of the amount of annual reduction in VOM emissions is too high (PC No. 28 and No. 29). Jefferson Smurfit reaches this conclusion because it postulates that all of the affected facilities will use add-on control equipment which will need to be operated for only seven of twelve months pursuant to 35 Ill. Adm. Code 215.106. Jefferson Smurfit therefore believes that the correct expected annual reduction should be 7/12 of the value calculated by the Agency (PC No. 28, Table 1), and that the cost per ton figures are correspondingly inflated.

Jefferson Smurfit fails to point out that even if the cost per ton figures were to be increased by 12/7, all but the extreme option of no-heat recovery incineration still fall below $2,000, including the Agency's estimates of the cost per ton effectiveness of Jefferson Smurfit's own facility ***. Moreover, it is clearly fallacious to apply the 12/7 factor to all facilities given the evidence before the Board that the generally expected method of compliance is the use of low-solvent inks *** rather than add-on controls. Additionally, if the control equipment is

to be used for only seven months per year, it would also be necessary to adjust annual operating costs downward, and thereby counter some of the increase in the cost per ton figures occasioned by the 12/7 multiplication."

It appears evident to us that in adopting the 100-ton exemption the Board considered the technical feasibility and the economical reasonableness of such an exemption level.

■ Lastly, appellants argue that USEPA's alleged policy that no exemption greater than 100 tons per year will be approved is directly in conflict with its long-established 5% equivalency rule. In a 1979 memorandum produced by G. T. Helms, chief of the USEPA's Control Program Operations Branch, Helms stated that the purpose of the 5% equivalency rule is to provide a mechanism for allowing States flexibility in developing their regulations. Under this rule, States may employ the 5% equivalency policy to justify minor source exemptions or the selection of differing "cut points" for regulatory coverage within a control technique guideline (CTG) category. According to Helms' memorandum and the testimony of Steven Rosenthal at the March 5, 1986, hearing on the EcIS, if a State chooses to employ the 5% procedure, it is to be applied on a CTG category basis by determining the total emissions allowed by the CTG presumptive norm and comparing this to the emissions allowed, including exemptions, by the proposed State regulation. If the difference is less than 5%, the USEPA will consider that no substantive difference exists between the two regulations and will approve the State regulation.

In the instant proceeding, the 100-ton exemption level contained in the proposed rule in question would, in fact, result in emissions within 5% of the allowable emissions contained in the CTG for flexographic and rotogravure printers. That a higher exemption level of 200 to 300 tons per year would fall within 5% of allowable emissions in the CTG, as appellants contend, is irrelevant. As appellees point out, Smurfit and Container are confusing standards for USEPA approvability with section 27(a) criteria applicable to Board rulemaking. Section 172(b)(3) of the CAA (42 U.S.C. §7502(b)(3) (1982)) requires Illinois to include in its SIP for areas such as the rotogravure and flexographic facilities involved here, which are nonattainment for ozone, "such reduction in emissions in existing sources in the area as may be obtained through the adoption, *at a minimum*, of reasonably available control technology." (Emphasis added.) Thus, the Board may adopt regulations stricter than the CAA requires as long as a technically feasible and economically reasonable basis exists for such adoption.

The Board is comprised of technically qualified individuals, and its

technical determinations must be upheld unless arbitrary and capricious. (*Central Illinois Public Service Co.*, 116 Ill. 2d at 412.) Here, the Board's decision to adopt a 100-ton-per-year exemption was not arbitrary, capricious, or unreasonable, as ample evidence existed in the record for the Board to find that there was a technically feasible and economically reasonable basis for setting the 100-ton exemption level.

We affirm the October 29, 1987, decision of the Pollution Control Board in its entirety.

Affirmed.

NASH and INGLIS, JJ., concur.