CENTRAL ILLINOIS LIGHT COMPANY, Plaintiff-Appellant, v. THE POLLUTION CONTROL BOARD et al., Respondents-Appellees.

Third District    No. 3—86—0841

Opinion filed July 24, 1987.

Sheldon A. Zabel, Sara L. Johnson, Marili McFawn, and Jerome M. Helfand, all of Schiff, Hardin & Waite, of Chicago, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Roma Jones Stewart, Solicitor General, and Michael K. Ohm and H. Alfred Ryan, Assistant Attorneys General, of Chicago, of counsel), for appellees.

PRESIDING JUSTICE SPITZ delivered the opinion of the court:

Central Illinois Light Company (CILCO) filed a proposal for a site-specific rulemaking on March 6, 1985, with the Illinois Pollution Control Board (Board) pursuant to section 28 of the Environmental Protection Act (Act) (Ill. Rev. Stat. 1985, ch. 111½, par. 1028) and the Board's procedural rules (35 Ill. Adm. Code 102.120 (1985)). The proposal requested the Board to promulgate a regulation, specific to CILCO's Edwards Station facility, which would replace the State limitations on effluent total suspended solids (TSS) with the limitations adopted as Federal law. In other words, if the requested relief was granted, the average monthly limitation would increase from 15 mg/1

to 30 mg/l, and the maximum daily limitation would increase from 30 mg/l to 100 mg/l. Pursuant to the Board's rulemaking authority, a hearing on this petition was held on September 11, 1985. On September 11, 1986, the Board adopted its opinion and order denying CILCO's request. CILCO filed a motion for rehearing on October 16, 1986. In response, on November 20, 1986, the Board adopted an order denying rehearing while also clarifying, in part, its earlier opinion. On December 23, 1986, CILCO filed a timely notice of appeal.

At issue in this appeal is the decision by the Board not to adopt the regulations proposed by CILCO to establish site-specific effluent limitations for TSS discharged in the effluent to the Illinois River from the ash-settling basin at the E. D. Edwards Station, which is located five miles south of Peoria along the Illinois River. It burns pulverized coal to generate electricity, leaving ash behind as a by-product. Water from the adjacent Illinois River is mixed with the ash and sluiced into an 83-acre pond located on the grounds of the power plant. CILCO uses the ash pond to settle ash and other suspended solids in the sluicing water prior to any discharge to the Illinois River. The primary by-product disposed of in the pond is ash. The purpose of the pond, which has been in operation since 1960, is to provide for and facilitate the sedimentation of the ash prior to discharge into the Illinois River.

CILCO is allowed to discharge to the Illinois River pursuant to a permit issued under the National Pollution Discharge Elimination System (NPDES) Program, Permit No. IL0001970. The permit, issued by the Environmental Protection Agency as part of the State of Illinois' administration of the NPDES permit program established under the Clean Water Act of 1977 (33 U.S.C. secs. 1251 through 1376 (1982)), imposed certain conditions upon this discharge, two of which are the State final effluent limitations for TSS. Those two permit conditions limit the total quantity of solid particulate matter suspended in the water, or TSS, reentering the Illinois River through the ash pond's outfall. The TSS limitations contained in the permit are the maximum allowed under the Board's regulations for water pollution. As the table below illustrates, the Board's effluent limitations for TSS, and consequently the permit limits, are more stringent than the TSS effluent limitations developed and adopted by the United States Environmental Protection Agency (USEPA) specifically for the steam electric industry based on the best treatment available. The site-specific rules proposed by CILCO are the same as the Federal limitations for TSS found at part 423 of the Code of Federal Regulations (40 C.F.R. secs. 423.10 through 423.17 (1986)).

|  | Illinois | Federal |
|---|---|---|
| Average Monthly Milligrams per Liter (mg/1) | 15 | 30 |
| Maximum Daily (mg/1) | 30 | 100 |

In its rulemaking petition, CILCO requested that the average monthly and the maximum daily effluent limitations for TSS in the discharge from the Edwards ash-settling pond be established by Board rule as 30 mg/l and 100 mg/l, respectively. In other words, CILCO requested that the Board adopt the federally promulgated TSS effluent limitations for the Edwards Station effluent in place of the more restrictive State limitations which are applicable to all point-source discharges to waters of the State, including the Illinois River.

In accordance with section 28 of the Act (Ill. Rev. Stat. 1985, ch. 111½, par. 1028) a hearing was held in Peoria on September 11, 1985, concerning CILCO's proposal. During the hearing, CILCO's witness testified that CILCO was unable to comply with the State standards and that this inability to comply with the standards was due to conditions beyond its control, such as high TSS influent, the existence of colloidal solids the ash pond could not remove, and the growth of algae. However, as respondents point out, CILCO provided no data which would confirm the supposition that the TSS in the influent actually constituted some or all of the TSS in the effluent; nor was data submitted which would support the theory that certain solids existed which the ash pond could not remove. Finally, CILCO submitted only conclusory statements regarding the use of an algaecide to remove or deter the negative impact of the algae growth. The record indicates that CILCO's Edwards Station was generally in compliance with the State TSS limitations between 1974 and 1979, but not after 1979.

CILCO considered alternate technologies in an effort to alleviate the periodic noncompliance. CILCO's witness testified that the physiochemical treatment method was unreasonably expensive at a cost of $550,000 a year total-levelized cost for 25 years. CILCO also provided testimony that indicated a new ash pond would cost approximately $11 million. Finally, CILCO maintained that a third alternative, that of ash disposal off-site, would be too expensive at $10 to $14 per ton. However, as respondents further point out, for each of the alleged unreasonable alternatives, CILCO submitted no evidence to establish a comparative basis upon which the Board could determine the reasonableness of the cost of any of these alternatives.

On September 11, 1986, the Board issued its final administrative

decision concerning CILCO's petition for a site-specific rulemaking. The Board denied the petition, stating:

"The Board finds it difficult to give weight to CILCO's contention that the elevated TSS levels in its effluent are attributable in major part to elevated levels in the influent water. Admittedly, the waters of the Illinois River are often turbid, and TSS concentrations of several hundreds of milligrams per liter are not uncommon. However, in the sluicing process employed by CILCO this influent water is mixed with large volumes of ash, thereby increasing its TSS concentration to very much higher levels than those of the raw influent water. It is at this stage, *after* CILCO has received the water, that the water achieves its maximum concentration of TSS, and it is this highly charged sluiced water which is required to be cleansed to the point of becoming an acceptable effluent. It is inescapable that even if CILCO had available to it an influent which was totally devoid of TSS, it would still be required to operate an ash pond which would function to a high degree of efficiency to remove the sluiced ash. Moreover, it is undemonstrated by CILCO that the non-organic TSS which occur in the effluent consist of the same solids which were derived from the river, as opposed to solids which were added as a consequence of using the water to sluice ash.

The Board believes that CILCO has failed to adequately address why the ash pond was capable of performing to standard in the past, but is apparently incapable of doing so now. If, indeed, it is the character of the influent water which is responsible for the present excursions, it would seem that similar excursions would have occurred in the past; there is no reason to believe, nor is it contended, that the character of the influent water has altered to a state which now causes higher excursion levels.

The Agency has expressed the belief that the fundamental cause of the present excursions is that the ash pond is too full to provide the necessary settling opportunity. CILCO has countered only with assertions that plant modifications and/or increases in the level of TSS in the influent water are possible causative factors. While the record does not allow the Board to determine which of these perspectives is correct, we do note that CILCO has failed to counter the arguments of the Agency.

The Board similarly believes that CILCO has failed to adequately address the issue of equitable and fair treatment. The

Agency contention that the electric stream generation industry in Illinois can and does comply with existing TSS standards at facilities other than the Station has not been refuted. The Board believes that, in the absence of evidence to the contrary, granting of the requested relief to CILCO could conflict with the goals of equitable and fair treatment.

Finally, the Board notes that CILCO has not demonstrated that compliance is technically infeasible. Compliance was clearly feasible at the Station between 1974 and 1979, and it is unrefuted that other electrical generating facilities in Illinois are presently able to maintain ash ponds in compliance with Illinois regulations. Similarly, CILCO has not made a demonstration that compliance is economically unreasonable. Again, other facilities have achieved compliance, and CILCO has not demonstrated any special conditions existent at the Station which would allow the Board to determine that the Station is in an economic position distinct from these facilities.

In view of the above considerations, the Board determines that the site-specific relief requested by CILCO must be denied."

The legislature passed the Act to "restore, protect and enhance the quality of the environment." (Ill. Rev. Stat. 1985, ch. 111½, par. 1002(b).) Pursuant to section 27(a) of the Act (Ill. Rev. Stat. 1985, ch. 111½, par. 1027(a)):

"(a) The Board may adopt substantive regulations as described in Sections 10, 13, 17, 22, 22.4 and 25 of this Act. Any such regulations may make different provisions as required by circumstances for different contaminant sources and for different geographical areas ***. In promulgating regulations under this Act, the Board shall take into account the existing physical conditions, the character of the area involved, including the character of surrounding land uses, zoning classifications, the nature of the existing air quality, or receiving body of water, as the case may be, and the technical feasibility and economic reasonableness of measuring or reducing the particular type of pollution."

On appeal, CILCO argues the Board failed to properly apply the statutory criteria to the evidence, the Board's decision was arbitrary, capricious and unreasonable, the Board erroneously introduced into its decision-making process the concept of "equitable and fair treatment," and finally, the Board failed to render a reasoned and explicable decision. Respondents argue the evidence presented by CILCO at

the hearing was insufficient, the Board properly considered and applied the evidence in the record to the statutory criteria, the Board's decision, in both form and content, fulfilled the requirements of the Act, and the Board's decision was not arbitrary, capricious or unreasonable.

After a thorough review of the evidence presented at the hearing in this case, we conclude the Board's determination that CILCO failed to demonstrate compliance is technically infeasible and economically unreasonable is amply supported by the record. As the Board pointed out in denying a motion by CILCO for a rehearing, these determinations regarding technical feasibility and economic reasonableness alone are sufficient to support the decision of the Board.

Regarding technical feasibility, the Board pointed out compliance was clearly feasible between 1974 and 1979, and stated that CILCO failed to adequately address the issue of why the system operated by CILCO was capable of performing to the TSS effluent standards in the past, but was incapable of currently meeting these standards. The Board expressed the opinion that the fundamental cause of the recent noncompliance was that the ash pond was too full to provide the necessary settling opportunity. CILCO contends that the "retention time" in the settling pond remained approximately constant at 90 hours from 1972 to 1984. However, the testimony of CILCO's expert witness reveals that the figure used to represent the retention time as of 1972 was an estimate, whereas the figure used to represent the retention time as of 1984 was based on an actual study. Furthermore, CILCO presented testimony regarding three alternatives to bring the facility within compliance, namely (1) off-site disposal of the ash; (2) building an entirely new ash pond; and (3) physiochemical treatment. Although CILCO presented extensive evidence regarding the costs of these alternatives, there is no credible evidence in the record to show that any of these methods would actually be technically infeasible.

The Board also concluded CILCO failed to demonstrate that compliance is economically unreasonable. CILCO's engineering consultant indicated that the capital expenditure for physiochemical treatment would be $4,610,000, and that the first-year operation and maintenance costs would be $204,000. According to CILCO's witness, the operating cost is approximately 17% of the entire 1985 operation and maintenance budget for all pollution-control programs at Edwards Station, and "[t]hat is pretty significant for one single piece of equipment to eat that much of your budget up." The consulting engineer further testified that off-site disposal "is a fairly expensive alternative as well. It would cost $10 to $14 per ton to haul the ash away from

the Edwards plant and put it in an acceptable landfill site." As respondents point out, "the record fails to provide the Board with an objective basis of comparison. In deciding if technology was economically reasonable, the Board needed a factual basis upon which reasonability could be determined." In order to determine if the costs of treating the effluent through either physiochemical methods or off-site disposal are reasonable, a great amount of information other than the costs of treatment must be known. CILCO asserts that the operating cost of physiochemical treatment would be 17% of their total operating costs of all pollution-control programs at the Edwards Station; however, there is no evidence to indicate how serious the TSS effluent problem is in comparison to other environmental problems which must be addressed at the Edwards Station. There was no evidence upon which the Board could determine that these costs were unreasonable, aside from the assertion of one of CILCO's witnesses that these costs are "certainly not reasonable." In short, CILCO failed to put the cost figures they supplied into perspective so that the Board would have sufficient data upon which it could make a determination regarding economic reasonableness.

Prior to the hearing of this matter, the Board issued an order, dated March 22, 1985, which stated, in pertinent part:

"The Board notes that the petition does not discuss the applicability of 35 Ill. Adm. Code 304.103 regarding background concentrations. *** The Board requests that [this matter] be addressed at hearing."

The aforementioned Illinois Administrative Code (Code) section provides:

"Because the effluent standards in this Part are based upon concentrations achievable with conventional treatment technology which is largely unaffected by ordinary levels of contaminants in intake water, they are absolute standards that must be met without subtracting background concentrations. However, it is not the intent of these regulations to require users to clean up contamination caused essentially by upstream sources or to require treatment when only traces of contaminants are added to the background. Compliance with the numerical effluent standards is therefore not required when effluent concentrations in excess of the standards result entirely from influent contaminations, evaporation, and/or the incidental addition of traces of materials not utilized or produced in the activity that is the source of the waste." (35 Ill. Adm. Code 304.103 (1985).)

In response to the Board's order regarding this Code provision,

CILCO's witness stated:

> "Actually, CILCO did consider the background concentrations of TSS, but the company felt that the federal effluent limitations were more applicable."

In other words, CILCO decided not to take advantage of the possible relief available to them pursuant to the Code (35 Ill. Adm. Code 304.103 (1985)). The Board specifically found that CILCO failed to show that the elevated TSS levels in the effluent were due to high levels of TSS in the influent waters and further found CILCO failed to demonstrate that the nonorganic TSS in the effluent consists of the same solids which are present in the influent. In a specially concurring opinion, one of the Board members stated:

> "I would suggest that CILCO collect data on the amount of colloidal substances in the incoming river water (R. 76-77). *** Under the 'background' portion of the Board's rules a credit would be allowed for the suspended solids proven to be from the river. Perhaps this credit alone would achieve compliance.
>
> * * *
>
> If the information needs mentioned above are filled then I would be amenable to re-evaluating this proposal."

As the court states in *Ryan v. Verbic* (1981), 97 Ill. App. 3d 739, 741, 423 N.E.2d 534, 537:

> "Under the Administrative Review Act, findings of fact by administrative agencies are prima facie true and correct; and the function of the reviewing court is limited to ascertaining whether the findings and decision of the administrative agency are against the manifest weight of the evidence. *Davern v. Civil Service Com.* (1970), 47 Ill. 2d 469, 471-72."

In *Willowbrook Development Corp. v. Pollution Control Board* (1981), 92 Ill. App. 3d 1074, 416 N.E.2d 385, the court affirmed the Board's denial of a variance request. Further, the court stated, "Deference is due the factual determinations of the Board since it is charged with primary responsibility in adjudicating in the specialized area of environmental disputes [citation], and we view those findings as *prima facie* true and correct [citation]." 92 Ill. App. 3d 1074, 1082, 416 N.E.2d 385, 392.

Furthermore, as the court stated in *Shell Oil Co. v. Pollution Control Board* (1976), 37 Ill. App. 3d 264, 270-71, 346 N.E.2d 212, 218:

> "When an administrative agency exercises its rule-making powers, it is performing a quasi-legislative (as opposed to a quasi-judicial) function. This fundamental principle explains the

discrepancy in the standards of judicial review of each type of proceedings; that is, when dealing with an adjudicatory proceeding, a reviewing court may only set aside the agency decision if it is clearly against the manifest weight of the evidence. When reviewing administrative rules and regulations, on the other hand, a court may not invalidate the regulation unless it is clearly arbitrary, unreasonable or capricious, because administrative agencies are inherently more qualified to decide technical problems and the mechanics of dealing with them. Because the courts lack the expertise possessed by administrative agencies, they should hesitate to find a regulation unreasonable. *** By definition *** the Pollution Control Board's regulations in these cases are founded upon application of agency expertise. The courts should not, and by general agreement may not, act as 'superagencies.' Such is essential if the basic notion of separation of powers is to survive."

In conclusion, we hold that based on the record of this case, the decision of the Board was not arbitrary and capricious. Furthermore, we conclude that the Board's decision, in both form and content, fulfilled the requirements of the Act. Consequently, for the reason stated herein, we hereby affirm the order of the Board which denied the CILCO's site-specific rulemaking proposal.

Affirmed.

LUND and KNECHT, JJ., concur.