GREATER PEORIA SANITARY AND SEWAGE DISPOSAL DISTRICT, Petitioner-Appellant, v. THE POLLUTION CONTROL BOARD *et al.*, Respondents-Appellees.

Third District   No. 3—88—0728

Opinion filed June 16, 1989.

Gardner, Carton & Douglas, of Chicago, and Frederick A. Johnson, of Swain, Johnson & Gard, of Peoria (Lee R. Cunningham and Richard J. Kissel, of counsel), for petitioner.

Neil F. Hartigan, Attorney General, and Thomas Davis, of Illinois Environmental Protection Agency, both of Springfield (Robert Ruiz, Solicitor General, and Patricia E. Collins, Michelle D. Jordan, and Matthew J. Dunn, Assistant Attorneys General, of Chicago, of counsel), for respondents.

JUSTICE SCOTT delivered the opinion of the court:

This is a direct appeal from an opinion and order dated October 6, 1988, of the Illinois Pollution Control Board (the Board) pursuant to section 41(a) of the Illinois Environmental Protection Act (the Act) (Ill. Rev. Stat. 1987, ch. 111½, par. 1041(a)). In its order, the Board denied appellant's, the Greater Peoria Sanitary and Sewage Disposal District's (the District's), request for site-specific relief from an ammonia-nitrogen effluent standard set forth at 35 Ill. Adm. Code §304.122 (1985) of the Board's water pollution regulations.

The District is a municipal corporation organized to collect industrial and domestic wastewaters within its service area and provide

treatment of those wastewaters before discharge into the Peoria Pool of the Illinois River. The District has a service area of 58.4 square miles, serves a population of approximately 135,000 and has a total annual operating budget of $5.5 million. The District's treatment process includes screening and grit removal, primary sedimentation, activated sludge treatment, rotating biological contactors (RBCs), tertiary clarification, tertiary ponds and chlorination.

Following promulgation of the current ammonia-nitrogen effluent limitations, the District received a State grant of $48.5 million in 1975 for upgrading its plant. As part of the project, the District installed a nitrification process consisting of 12 reinforced concrete tanks with seven RBCs per tank for a total of 84 RBCs. The cost of this particular project was $4.7 million and it became operational in 1979. The estimated useful life of these units is 20 years, or roughly a little less than 11 more years.

The nitrification process was designed to meet the ammonia-nitrogen limitation of 35 Ill. Adm. Code §304.122(a) (1985), which states:

> "a) No effluent from any source which discharges to the Illinois River, the Des Plaines River downstream of its confluence with the Chicago River System or the Calumet River System, and whose untreated waste load is 50,000 or more population equivalents shall contain more that 2.5 mg/1 of ammonia nitrogen as N during the months of April through October, or 4 mg/1 at other times."

This particular subsection is applicable to only three municipal corporations: The District, the Metropolitan Sanitary District of Greater Chicago, and the City of Joliet. There are no other specific ammonia-nitrogen effluent standards applicable to other municipal discharges into the Illinois River.

Annual costs of the District's nitrification process include operation and maintenance (O & M) costs and replacement costs. O & M costs for the past four fiscal years have averaged $81,960, 89% of which is for electrical power. Approximately $192,000 per year has also been budgeted, although not expended, for replacement costs of the RBCs. Part of the District's electrical power cost, however, will be alleviated in future years because of a recently completed project allowing the District to produce its own electrical power.

The District's rulemaking petition, filed pursuant to section 28 of the Environmental Protection Act, proposed to totally exempt the District from the effluent standards for ammonia-nitrogen of 35 Ill. Adm. Code §304.122(a) (1985). The District also submitted in its petition that no economic impact study need be prepared by the Illinois

Department of Energy and Natural Resources (DENR) pursuant to section 4 of "An Act in relation to natural resources ***" (Ill. Rev. Stat. 1987, ch. 96½, par. 7404(d)). By letter, dated July 7, 1988, the DENR recorded its determination that a formal economic impact study would not be done in regard to the District's petition because "[t]he cost of making a formal study is economically unreasonable in relation to the value of the study to the Board in determining the adverse economic impact of the regulation."

In its petition, the District claims that exemption from the above-named effluent standard is justified at this time, because even without the ammonia-nitrogen removal process, the District's effluents will not adversely affect downstream dissolved-oxygen levels in that it will still be required to meet other general water quality standards. As support, the District submitted several Illinois State Water Survey reports conducted partially by some of the same authors who conducted the original studies relied on by the Board when setting the current effluent standards from which the District seeks site-specific relief.

In its opinion and order, the Board found that it is technically feasible for the District to meet the current ammonia-nitrogen effluent standard; the District failed to adequately prove compliance with the standard was economically unreasonable; violations of the dissolved-oxygen standard caused by excessive oxygen demand, to which ammonia is a contributor, continue to occur downstream of the District's discharge; the "restore, maintain and enhance" provision of section 11(b) of the Illinois Environmental Protection Act (Ill. Rev. Stat. 1987, ch. 111½, par. 1011(b)) requires Illinois to go beyond a minimal clean-up goal and resist the temptation to pollute waters at the maximum allowable limits. The District is proposing an untried plan which would allow the general water quality standards to be consistently approached and did not present any evidence that the plan could operate "close to the line" without inadvertently exceeding the standard.

■ Section 13(a)(1) of the Act authorizes the Board to proscribe water quality standard, and section 13(a)(2) empowers the Board to prescribe effluent standards. (Ill. Rev. Stat. 1987, ch. 111½, pars. 1013(a)(1), (a)(2)). Section 27(a) allows the Board to adopt substantive regulations in conformity with section 13, which "may include regulations specific to individual persons or sites." (Ill. Rev. Stat. 1987, ch. 111½, par. 1027(a).) Thus, it is clear the Board has the power to adopt the effluent standard from which the District requests relief.

■ A rejection of a site-specific standard is in effect the adoption of a previously existing regulation. (*Citizens Utilities Co. v. Pollution Control Board* (1985), 134 Ill. App. 3d 111, 479 N.E.2d 1213.) The

Board, therefore, was performing a quasi-legislative, as opposed to quasi-judicial, function in denying the District's request for site-specific relief. Accordingly, our standard for review is whether the Board's decision was arbitrary and capricious. *Central Illinois Public Service Co. v. Pollution Control Board* (1987), 116 Ill. 2d 397, 507 N.E.2d 819; *Central Illinois Light Co. v. Pollution Control Board* (1987), 159 Ill. App. 3d 389, 511 N.E.2d 269.

It is apparent that unless specific levels of justification are provided in a regulation for an adjusted standard pursuant to section 28.1 of the Act, the Board, in considering site-specific relief, must take into account certain statutory criteria outlined in section 27(a) and also provide procedural safeguards pursuant to section 28 of the Act. See *Central Illinois Public Service Co.*, 116 Ill. 2d 397, 507 N.E.2d 819.

Section 27(a) states in part:

"In promulgating regulations under this Act, the Board shall take into account the existing physical conditions, the character of the area involved, including the character of surrounding land uses, zoning classifications, the nature of the existing air quality, or receiving body of water, as the case may be, and the technical feasibility and economic reasonableness of measuring or reducing the particular type of pollution." Ill. Rev. Stat. 1987, ch. 111½, par. 1027(a).

See also *Central Illinois Light Co.*, 159 Ill. App. 3d 389, 511 N.E.2d 269.

The District's primary argument is that the Board is requiring treatment of ammonia-nitrogen for treatment's sake because an input of ammonia-nitrogen effluent from the District that complies with general toxicity standards and mixing zone requirements would have an insignificant effect on downstream dissolved oxygen levels. Thus, the cost of requiring the District to maintain and replace the facilities necessary to treat ammonia-nitrogen effluent is economically unreasonable when considering the economic impact of the current standard with a less restrictive standard. As a point of clarification, the standard, from which the District seeks relief, regards the direct regulation of the emission of effluents into the water. The general toxicity and mixing zone standards are actual water quality standards and would not regulate, except in an indirect way, the effluent discharge by the District.

Upon our review of the record, we must agree with the decision of the Board. In compliance with the dictates of section 27(a) of the Act, the Board expressly determined that compliance with the efflu-

ent standard of 35 Ill. Adm. Code 314.122(a) (1985) is technically feasible. The District is indisputably complying with the standard and has done so for the past 10 years. Regarding the District's contention that there would be no significant decrease in water quality if the site-specific relief were granted, the Board noted there are currently ongoing violations of the dissolved oxygen standard downstream caused by excessive oxygen demand and that ammonia is a contributor. Therefore, allowing a relaxed standard of ammonia input into the Illinois River, in light of current ongoing violations of water quality, is not in accord with the stated purpose of restoring, maintaining and enhancing the purity of this State's waters under section 111(b) of the Act. (Ill. Rev. Stat. 1987, ch. 111½, par. 1011(b).) If the ultimate goal of the Environmental Protection Act is to clean up the air and the waters of this State, then positive action to do so must be taken that continually creates tougher standards for compliance. Moreover, the District's contention that the cost burden of the more restrictive standard warrants exception is unpersuasive. There has been no mention that the District is currently unable to cover the cost of compliance, but in fact has been able to save money each year to replace equipment in the future. We commend the District's foresight but decline to find compliance economically unreasonable at this time.

██ It has been held that determinations regarding technical feasibility and economic reasonableness alone are sufficient to support the decision of the Board. (*Central Illinois Light Co.*, 159 Ill. App. 3d 389, 511 N.E.2d 269.) In this case, however, the Board took a closer look and determined that ongoing violations of water quality downstream were a critical situation that supported denial of the District's request. This court is not to determine whether the Board's action is wise or even the most reasonable since the Board is made up of technically qualified individuals, whose opinions require deference unless arbitrary or capricious. *Central Illinois Public Service Co.*, 116 Ill. 2d 397, 507 N.E.2d 819.

For all of the foregoing reasons, the decision of the Pollution Control Board is affirmed.

Affirmed.

WOMBACHER, P.J., and STOUDER, J., concur.