(No. 72850.—■)

GRANITE CITY DIVISION OF NATIONAL STEEL COMPANY *et al.*, Appellants, v. THE ILLINOIS POLLUTION CONTROL BOARD, Appellee.

*Opinion filed April 15, 1993.*

150

HARRISON and McMORROW, JJ., took no part.

MILLER, C.J., dissenting.

James T. Harrington, Heidi E. Hanson, David L. Rieser, Chuck W. Wesselhoft and Darren J. Hunter, of Ross & Hardies, of Chicago, and R. Eric Robertson, of Lueders, Robertson & Konzen, of Granite City, for appellants.

Roland W. Burris, Attorney General, of Springfield (Rosalyn Kaplan, Solicitor General, and James L. Morgan, Assistant Attorney General, of counsel), for appellee.

Martha A. Churchill, of Chicago, for *amici curiae* Chicago Association of Commerce & Industry *et al.*

JUSTICE BILANDIC delivered the opinion of the court:

In this appeal, we are asked to consider the validity of recent amendments which the Illinois Pollution Con-

trol Board (Board) made to its water quality standards. Generally, water quality standards are statewide pollution control standards for Illinois waters which the Board promulgates in rulemaking proceedings. The water quality standards at issue in this appeal were adopted by the Board in a rulemaking proceeding, pursuant to the Illinois Environmental Protection Act (Act) (Ill. Rev. Stat. 1989, ch. 111½, par. 1001 *et seq.*). The water quality standards are codified in title 35, subtitle C, of the Illinois Administrative Code (Code) (35 Ill. Adm. Code §§301 through 309 (1992)). The instant appeal addresses the validity of the Board's amendments.

Within the Act, the legislature created the Board and granted it, *inter alia*, rulemaking authority. (Ill. Rev. Stat. 1989, ch. 111½, pars. 1003.04, 1005, 1013.) The legislature also created the Illinois Environmental Agency (Agency) and granted it authority to, *inter alia*, enforce Board regulations and administer permit systems established by the Act or Board regulations. (Ill. Rev. Stat. 1989, ch. 111½, par. 1004.) Pursuant to the Act, the Board is the body which, *inter alia*, determines and promulgates statewide water quality standards (Ill. Rev. Stat. 1989, ch. 111½, par. 1013(a)(1)), while the Agency is, *inter alia*, the body responsible for enforcing the Board's statewide standards (Ill. Rev. Stat. 1989, ch. 111½, par. 1004). The amended regulations at issue in this appeal were proposed by the Agency and adopted by the Board on an expedited basis pursuant to section 28.2 of the Act (Ill. Rev. Stat. 1989, ch. 111½, par. 1028.2). Thereafter, petitioners, Granite City Division of National Steel Company, Laclede Steel Company, USS Division of USX Corporation and the Illinois Steel Group, petitioned the appellate court for judicial review of the validity of the Board's amendments pursuant to section 29 and section 41 of the Act (Ill. Rev. Stat. 1989, ch. 111½, pars. 1029, 1041). The appellate court affirmed the Board's

rulemaking and upheld the instant amendments to the Board's water quality standards. (221 Ill. App. 3d 68.) We granted petitioners leave to appeal (134 Ill. 2d R. 315). A joint *amicus curiae* brief has been submitted by the Chicago Association of Commerce and Industry, Illinois Chamber of Commerce, Illinois Manufacturers Association, and Mid-America Legal Foundation in support of the petitioners.

In the instant rulemaking, the Board adopted specific numeric standards which represent numeric concentration limits allowable in a discharger's waste for certain known toxics such as arsenic and cyanide. The Board also adopted regulations pertaining to its "narrative standard" and "mixing," each of which will be explained below. Before this court, petitioners challenge the validity of the regulations pertaining to: (1) the narrative standard and (2) mixing. The issues to be resolved in this appeal are whether: (a) the regulations are unconstitutionally vague; (b) the regulations constitute an improper delegation of the Board's rulemaking authority to the Agency; and (c) the Board properly considered the technical feasibility and economic reasonableness of these regulations in its rulemaking process as required by the Act (Ill. Rev. Stat. 1989, ch. 111½, par. 1027(a)). In order for us to address petitioners' contentions, it is necessary to briefly discuss the substance of the regulations at issue.

### 1. The Narrative Standard

In accordance with a guidance letter issued by the United States Environmental Protection Agency, the Board's regulations establish a dual standard system for controlling substances which are toxic to human health, or to animal, plant or aquatic life. The Board established this dual system in order to provide a complete regulatory scheme to prevent toxic polluting of Illinois waters.

As stated, the regulations set forth the maximum allowable concentration limits for certain known toxics in specific numeric terms (numeric standards). (35 Ill. Adm. Code §302.208 (1992).) For all other toxic substances, including those that are, as yet, undetected, the regulations set forth a "narrative standard." The Board's narrative standard provides:

"Waters of the State shall be free from any substances or combination of substances in concentrations toxic or harmful to human health, or to animal, plant or aquatic · life." 35 Ill. Adm. Code §302.210 (1992).

In essence, the narrative standard prohibits "actual toxicity" caused either by the nature of the substance or the quantity of the substance. Under the narrative standard, any substance or combination of substances is deemed to be toxic and in violation of the narrative standard if present in concentrations exceeding any of five basic "criteria" which relate to human health and animal, plant and aquatic life. (35 Ill. Adm. Code §§302.210(a) through (c) (1992).) The amendments *sub judice* contain an elaborate and complex series of procedures (subpart F) which the Agency is directed to follow to derive narrative "criteria." (35 Ill. Adm. Code §302, subpart F (1992).) The narrative criteria are numeric concentrations limits which will be used to determine whether a discharger is in compliance with the Board's narrative standard. Under the regulations, the Agency would normally derive criteria when a discharger applies for a National Pollutant Discharge Elimination System (NPDES) permit and the derived criteria are then included as a permit condition or limitation in the applicant's permit.

The criteria established by the narrative standard have no fixed values. Rather, they are derived by the Agency on a case-by-case basis in accordance with the procedures, data assessment methods and test protocols

set forth in subpart F. In deriving the criteria, the Agency must use data which is site-specific to the particular permit applicant because the criteria are based on, *inter alia*, the nature of the permittee's effluent, the nature and location of the particular body of receiving water, and the particular species which live therein. Once derived, the Agency must publish a list of derived criteria in the Illinois Register at least quarterly. (35 Ill. Adm. Code §302.669(a) (1992).) In addition, the Agency must retain the record established in its derivation process. 35 Ill. Adm. Code §302.210(f)(2) (1992).

A discharger may challenge both the validity of a derived criterion and the correctness of the Agency's application of the criterion to the particular discharger. (35 Ill. Adm. Code §302.210(f) (1992).) Under the regulations, dischargers have an opportunity for case-by-case Board review of the criterion whenever that criterion is first applied to the discharger in either a permit appeal or an enforcement action brought against it for violation of the Act, the Board's regulations or its permit conditions. (35 Ill. Adm. Code §§302.210(f)(1), (f)(2) (1992).) On appeal, the Agency has the burden of providing the derivation record. (35 Ill. Adm. Code §302.210(f)(2) (1992).) In permit appeals, the Agency has the burden of going forward with the basis for its derivation of the criterion. (35 Ill. Adm. Code §302.210(f)(2) (1992).) In an enforcement action, the Agency has the burden of going forward with proof and of persuasion regarding the validity and proper application of the criterion. (35 Ill. Adm. Code §302.210(f)(3) (1992).) There is no presumption in favor of the validity or proper application of any Agency-derived criteria. 35 Ill. Adm. Code §302.210(f)(2) (1992).

In its order, the Board explained the purpose of the narrative standard and subpart F criteria as follows:

"The problem is that there are many substances for which we cannot identify with much precision what constitutes a 'toxic amount'. In fact, the down-side is that we cannot do this for the great *majority* of toxic substances; the many necessary studies simply have not yet been done, and in many cases the toxic nature of substances themselves may not have been identified or the toxic substance may not even have been yet manufactured. \*\*\*

The Agency has proposed, and we accept, what we believe to be an innovative and constructive approach to defining what constitutes a 'toxic amount' for those substances for which we cannot yet realistically specify a numeric standard. The approach consists of setting up a tight series of procedures and directives by which the best currently-available toxicity information is used to approximate that numeric criterion which might eventually evolve into a standard as more and better data accumulate.
\*\*\*

\*\*\* [T]he narrative standard approach allows for rapid reaction against a substance not previously present, existent or recognized as being toxic. Environmental control history is replete with examples of new needs and new technologies causing the development, and entry into the environment, of new substances. Moreover, the toxicity of some of these substances has not been recognized until long after their appearance in the environment. It is perhaps one of the major shortcomings of environmental control that it has, not uncommonly, been sluggish in responding to the appearance of new toxic substances. Today's amendments will not do away with the time necessary to respond to new pollutants, but it can substantially shorten that time. Under the instant amendments, whenever it is recognized that a new substance offers a threat, the Agency would have the ability to immediately react to whatever sources may be responsible and to work with that source in eliminating the threat." (*In re Amendments to Title 35, Subtitle C* (January 25, 1990), Ill. PCB Order

No. R88—21, docket A, at 27-28 (hereinafter Board Order).)

As the Board noted, a major advantage of subpart F and the narrative criteria concept is that it allows the Agency to use data continually developed by experts throughout the country in the criterion-derivation process.

### 2. Mixing Regulations

Two other features of the amended regulations are their provisions for "allowed mixing" (35 Ill. Adm. Code §§302.102(a), (b) (1992)), and "mixing zones" (35 Ill. Adm. Code §302.102(d) (1992)). Under these provisions, a discharger may be allowed to comply with the Board's water quality standards "by mixture of an effluent with its receiving waters." (35 Ill. Adm. Code §302.102(a) (1992) (allowed-mixing concept).) Pursuant to the allowed-mixing concept, the regulations provide that, if a discharger complies with certain regulatory requirements, "an opportunity *shall be allowed* for compliance with 35 Ill. Adm. Code 304.105 by mixture of an effluent with its receiving waters." (Emphasis added.) (35 Ill. Adm. Code §302.102(a) (1992).) The allowed-mixing regulations further set forth 12 factors which limit the allowed-mixing area. 35 Ill. Adm. Code §§302.102(b)(1) through (b)(12) (1992).

In contrast to the allowed-mixing concept, the regulations also provide for "mixing zones" and "zones of initial dilution" (ZID). (35 Ill. Adm. Code §§302.102(d), (e) (1992).) A mixing zone is an area for allowed mixing which is formally defined by the Agency in the NPDES permitting process and, if granted, is included as a condition in the permittee's NPDES permit. A ZID is likewise formally defined and granted by the Agency during the permitting process and, if granted, is included in the discharger's mixing-zone permit condition.

The significance of having an area of allowed mixing or a mixing-zone permit condition is that it alters the point in the receiving waters at which the Board's various water quality standards must be met. Outside of the allowed-mixing area or the mixing zone, all water quality standards, both acute and chronic as well as the subpart criteria, must be met. Inside the allowed-mixing area or the mixing zone, only the acute toxicity standards and acute narrative criteria must be met by the discharger, subject to the existence of a ZID. If a ZID is granted, the discharger is excused from compliance with the Board's acute toxicity standards and the acute criteria within the ZID.

The Agency's permit decisions regarding mixing-zone and ZID conditions control the permittee's opportunity to utilize mixing as a means of compliance with the Board's water quality standards. (35 Ill. Adm. Code §§302.102(g), (h) (1992).) If there is no NPDES permit in effect or the permit is silent as to mixing, the discharger may invoke the general allowed-mixing provisions as a defense to any enforcement action brought against it for violations of the Board's water quality standards and has the burden to prove that it is in compliance with the allowed-mixing regulations. (35 Ill. Adm. Code §302.102(i) (1992).) If the Agency has made a mixing-zone or ZID determination, the permittee may appeal that determination to the Board pursuant to section 40 of the Act (Ill. Rev. Stat. 1989, ch. 111½, par. 1040 (permit appeals)). 35 Ill. Adm. Code §302.102(f) (1992).

## OPINION

As stated, the Board is an administrative agency created by the legislature. As such, it is a quasi-legislative as well as a quasi-judicial body. (See *Monsanto Co. v. Pollution Control Board* (1977), 67 Ill. 2d 276, 289-91.) Pursuant to the Act, the Board has statutory authority

to "determine, define and implement the environmental control standards applicable in the State of Illinois and may adopt rules and regulations in accordance with Title VII of this Act." (Ill. Rev. Stat. 1989, ch. 111½, par. 1005(b).) The Board's exercise of its authority is governed by the Act and the Illinois Administrative Procedure Act (Ill. Rev. Stat. 1989, ch. 127, par. 1001 *et seq.*).

Because the Board is an administrative agency, judicial review of its rulemaking is limited. (*People ex rel. Hartigan v. Illinois Commerce Comm'n* (1992), 148 Ill. 2d 348, 366.) Rules and regulations promulgated by the Board have the force and effect of law, are presumed to be valid, and will be construed by the same standards as statutes. (*Celotex Corp. v. Pollution Control Board* (1983), 94 Ill. 2d 107, 126; *Northern Illinois Automobile Wreckers & Rebuilders Association v. Dixon* (1979), 75 Ill. 2d 53, 58.) When an agency has acted in its rulemaking capacity, a court will not substitute its judgment for that of the agency. (*Monsanto*, 67 Ill. 2d at 290.) Regulations adopted by the Board pursuant to its statutory authority will not be set aside unless they are arbitrary and capricious. *Celotex Corp.*, 94 Ill. 2d at 125; *Monsanto*, 67 Ill. 2d at 288-89.

In addition to establishing the Board, the Act also created the Agency. (Ill. Rev. Stat. 1989, ch. 111½, par. 1004.) The Act grants the Agency authority to, *inter alia*, collect and disseminate information and technical data, conduct experiments necessary to carry out the purposes of the Act and Board regulations; conduct inspections and surveillance of discharge sources; monitor environmental quality; administer permit and certification systems; require submission of complete plans and specifications as well as other data from permit applicants; investigate and enforce violations of the Act or the Board's rules; and issue administrative citations and take summary enforcement action. See Ill. Rev. Stat.

1989, ch. 111½, pars. 1004, 1021, 1030, 1031, 1031.1, 1039.

Bearing in mind the foregoing principles, we now turn to the merits of petitioners' appeal.

## A. VAGUENESS

Initially, petitioners lodge a facial challenge to the regulations *sub judice* on grounds of vagueness. The petitioners assert that the challenged regulations are so vague and uncertain that they violate due process of law in that they fail to provide fair warning to dischargers of what conduct is prohibited. Petitioners also contend that the regulations are unconstitutionally vague in that they fail to provide explicit standards for their administration and, consequently, will result in arbitrary and discriminatory enforcement by the Agency.

Because petitioners challenge the regulations as being vague on their face, they must establish that the regulations at issue are impermissibly vague in all their applications in order to prevail. (*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.* (1982), 455 U.S. 489, 494-95, 71 L. Ed. 2d 362, 369, 102 S. Ct. 1186, 1191.) A law or regulation is impermissibly vague and violates due process if it leaves the regulated community unsure of what conduct is prohibited or fails to provide adequate guidelines to the administrative body charged with its enforcement. (*Smith v. Goguen* (1974), 415 U.S. 566, 575-76, 39 L. Ed. 2d 605, 613, 94 S. Ct. 1242, 1248-49.) As this court has previously stated:

> " 'A legislative act which is so vague, indefinite and uncertain that the courts are unable, by accepted rules of construction, to determine, with any reasonable degree of certainty, what the legislature intended, or which is so incomplete or conflicting and inconsistent in its provisions that it cannot be executed, will be declared to be inoperative and void. [Citations.] An act is void the language of

which appears, on its face, to have a meaning but to which it is impossible to give any precise or intelligible application in the circumstances under which it is intended to operate.' [Citation.]" (Emphasis omitted.) *Spinelli v. Immanuel Lutheran Evangelical Congregation, Inc.* (1987), 118 Ill. 2d 389, 402, quoting *Mayhew v. Nelson* (1931), 346 Ill. 381, 387.

The language of the regulation must convey with sufficient certainty fair warning and notice of what constitutes prohibited conduct, and what is fair and adequate is measured by common understanding. It must, however, be borne in mind that "we can never expect mathematical certainty from our language." (*Grayned v. City of Rockford* (1972), 408 U.S. 104, 110, 33 L. Ed. 2d 222, 228-29, 92 S. Ct. 2294, 2300.) Where the words and phrases of the rule have a technical or special meaning commonly understood by the regulated community, the certainty requirement is satisfied. (*Pre-School Owners Association of Illinois, Inc. v. Department of Children & Family Services* (1988), 119 Ill. 2d 268, 285; *People ex rel. Spitzer v. County of La Salle* (1960), 20 Ill. 2d 18, 27.) A regulation is not unconstitutionally vague merely because the mind can conjure up hypothetical situations in which the meaning of some terms may be in question. (*Scott v. Department of Commerce & Community Affairs* (1981), 84 Ill. 2d 42, 50, quoting *Schiller Park Colonial Inn, Inc. v. Berz* (1976), 63 Ill. 2d 499, 513.) Moreover, the fact that the regulation is susceptible to misapplication will not necessarily render it unconstitutional. *Stein v. Howlett* (1972), 52 Ill. 2d 570, 580.

We also note that administrative regulations, like statutes, are presumed to be valid, and the party challenging them has the burden of showing that they are unconstitutional. (*Scott v. Department of Commerce & Community Affairs* (1981), 84 Ill. 2d 42, 50; *Automobile Wreckers*, 75 Ill. 2d at 58.) This court has a duty to af-

firm the constitutionality and validity of administrative regulations if it can reasonably be done, and if their construction is doubtful, any doubts will be resolved in favor of the validity of the law or rule challenged. See, *e.g., People v. Haywood* (1987), 118 Ill. 2d 263, 271; *People v. Bales* (1985), 108 Ill. 2d 182, 188.

We turn now to consider the merits of petitioners' vagueness challenge to: (1) the narrative standard and subpart F and (2) the mixing regulations.

### 1. Narrative Standard and Subpart F

Petitioners assert, in essence, that subpart F fails to provide dischargers with adequate notice of what is expected of their facilities. This is so, they argue, because the formulae set forth in the subpart F regulatory procedure contain several decision points where reasonable experts in the field might disagree, as well as several points where reasonable experts will disagree. In other words, there are several points in the procedural framework where one following the formulae is required to make a judgment call. Consequently, petitioners argue, subpart F will not yield reproducible results. Because there are variables built into the regulatory procedure, petitioners contend that they could work through the formulae, develop and comply with applicable criteria, and still be subjected to criminal and civil penalties if the Agency happens to calculate applicable criteria differently.

Petitioners' argument reveals a fundamental misunderstanding of the narrative standard and the subpart F regulations. Under these regulations, in the normal course of events, the *Agency* is directed to derive criteria in the permitting process in the first instance and then directed to publish any derived criteria in the Illinois Register to provide notice to all who may be affected. The narrative standard and subpart F set forth a

regulatory procedure rather than any environmental discharge limitations. The regulatory procedure is promulgated to govern the Agency in the derivation process and it is the Agency which is the administrative body directed to make any necessary "judgment calls" in applying subpart F formulae to derive "criteria." Until derived by the Agency, that particular criterion does not yet exist and cannot be used to surprise unsuspecting dischargers, as petitioners contended in oral argument. Once derived and applied to a discharger, the regulations offer the discharger an opportunity to challenge the validity of the derived criteria as well as its applicability to the particular discharger.

This is the normal course of circumstances under which the Board intended these regulations to operate. We have no trouble discerning from the plain language of the regulations what the Board intended, nor do we find the regulatory procedure so incomplete or conflicting that it cannot be executed. The regulations give fair warning to the regulated community of, *inter alia*, how and when the Agency will derive criteria, what is expected of dischargers with respect to criteria derived by the Agency, and what avenues of appeal are open to dischargers to contest the validity and application of the Agency-derived criteria. Although subpart F contains special, technical language and scientific formulae, we find it to be sufficiently certain to apprise the regulated community of the derivation procedures that the Agency will use in establishing narrative criteria. The Board's determination that a regulatory system for the derivation of narrative criteria was needed to protect the waters of Illinois as well as its choice of the derivation procedures embodied in subpart F are matters peculiarly within the special expertise and judgment of the Board, to which this court defers. See *Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.* (1983),

462 U.S. 87, 103, 76 L. Ed. 2d 437, 450, 103 S. Ct. 2246, 2255.

Because petitioners have failed to prove that the regulations are vague in all of their applications, we find that they comport with due process. The fact that the petitioners can develop hypothetical situations in which experts may reach different conclusions when applying the procedures set out in subpart F will not render the regulations invalid. Moreover, the fact that the criteria-derivation regulations may be misapplied will not render them unconstitutional either, especially in light of the regulatory framework allowing for review. As this court has stated:

> "If there are borderline cases where the Act is erroneously applied, these uncertainties can be resolved through judicial interpretation. The fact that such borderline cases exist will not, however, render the statute unconstitutional. [Citations.] Also, the fact that there may occur a misapplication of the statute will not render it invalid. [Citation.]" (*O'Connor v. A & P Enterprises* (1980), 81 Ill. 2d 260, 269.)

Therefore, for the reasons stated above, we reject petitioners' vagueness challenge to these regulations.

## 2. Mixing Regulations

We now consider petitioners' vagueness challenge to the mixing regulations. Essentially, petitioners argue that these regulations are so indefinite and uncertain that petitioners cannot determine whether or not they would be entitled to a "mixing zone" or a ZID and, if so, the zone's size and shape. Petitioners assert that the ability to make this determination is imperative because it alters the point at which they are required to comply with certain water quality standards. Petitioners also contend that the regulations fail to provide adequate guidelines to the Agency for their application, thereby

encouraging arbitrary and discriminatory enforcement. In this regard, petitioners assert that the Agency has unbridled discretion in granting or denying mixing zones and ZIDs and that the rules fail to provide sufficient standards to guide the Agency in its decision.

The amended regulations specify that "an opportunity *shall* be allowed" for mixing provided the discharger complies with certain administrative requirements and its circumstances fall within the 12 regulatory factors which limit the allowed-mixing area. (Emphasis added.) (35 Ill. Adm. Code §§302.102(a), (b)(1) through (b)(12) (1992).) These limiting factors pertain to the existence of an allowed-mixing area as well as to its size and shape. (35 Ill. Adm. Code §§302.102(b)(1) through (b)(12) (1992).) Although the language of the regulations which set forth the 12 limiting factors is somewhat technical, we find it sufficient to fairly apprise dischargers of the requirements they must meet in order to take advantage of the allowed-mixing opportunity. If a discharger falls within the limiting factors and complies with the administrative requirements set forth in the mixing regulations, that discharger is entitled to utilize allowed mixing. The opportunity to use allowed mixing does not, in the first instance, involve the Agency or its discretion at all. In addition, the regulations apprise the discharger of its burden to prove compliance with the mixing regulations in any enforcement action instituted against it. (See 35 Ill. Adm. Code §§302.102(g), (i) (1992).) If the discharger can prove to the Board that it falls within the allowed-mixing regulations, mixing *shall* be allowed. As the Board stated in its order:

> "Several of today's amendments are intended to give expression to our intent that affirmation within an NPDES permit is not a necessary condition to allowed mixing. These include the addition of "Allowed Mixing" to the title of Section 302.102 and the absence of any ref-

erence to mixing zones or NPDES permits within the general applicability statement of subsection (a) or the limiting conditions specified in subsection (b).

We nevertheless again emphasize that allowed mixing must always occur only as a last resort when there is not otherwise a tenable alternative for the discharger. Moreover, whenever anyone invokes allowed mixing as a method of compliance with water quality standards *absent* an NPDES-recognized mixing zone, the Board intends that there be a heavy burden of proof on that person to show that the portion, area, and volume of the receiving water used for mixing is no less restrictive than would have occurred with an NPDES mixing zone." (Board Order, at 20-21.)

We do not find these allowed-mixing regulations to be so indefinite and uncertain that we cannot determine what the Board intended, nor do we find them to be incapable of application. Therefore, we reject petitioners' vagueness challenge to the allowed-mixing regulations.

Petitioners also make a vagueness challenge to the Board's regulations concerning mixing zones and ZIDs. We do not agree with petitioners' assertions that the regulations pertaining to mixing zones and ZIDs are unconstitutionally vague. If a permit applicant applies to the Agency for a formally defined mixing zone, the regulations state that, upon proof by the applicant that the proposed mixing zone conforms with certain statutory and administrative requirements, including the 12 limiting factors set forth in the general mixing regulations, the Agency *shall* include a mixing-zone condition in the applicant's NPDES permit. (35 Ill. Adm. Code §302.102(d) (1992).) The same is true for ZIDs. (35 Ill. Adm. Code §302.102(e) (1992).) Under the regulations, upon proper proof by the applicant, the Agency must grant the permit condition(s). We find that these regulations provide sufficient standards to the Agency and will not result in arbitrary and discriminatory enforcement.

In addition, the permit applicant can appeal to the Board any Agency decisions pertaining to mixing zones or ZIDs. 35 Ill. Adm. Code §302.102(f) (1992).

In the normal course of events, these regulations provide dischargers with fair warning and notice of whether they may utilize allowed mixing and their burden to prove compliance with the allowed-mixing regulations. The regulations also clearly inform dischargers of mixing zones and ZIDs, that they are Agency-granted permit conditions, the standards governing the Agency's mixing-zone and ZID decisions, and the opportunity for review of these Agency determinations before the Board. Contrary to petitioners' contentions, we find that these regulations set forth with sufficient clarity what the Board intended and that they are not so indefinite, inconsistent or incomplete that they cannot be executed. Therefore, petitioners have failed to prove that any of the mixing regulations are vague in all their applications. The regulations are not void merely because they may be misapplied or petitioners can conjure up some hypothetical situations in which their meaning or applicability may be suspect.

## B. DELEGATION OF AUTHORITY

Petitioners next challenge the regulations pertaining to the narrative standard and subpart F as well as the mixing regulations as constituting an improper delegation to the Agency of the Board's rulemaking authority. They allege that the amended regulations delegate the Board's authority to make statewide standards of general applicability to the Agency. We will consider petitioner's challenge to each portion of the regulations separately.

### 1. Narrative Standard and Subpart F

Petitioners contend that the subpart F regulations re-

lating to the narrative criteria-derivation process essentially grant the Agency rulemaking authority to set standards of general applicability. They argue that these regulations are unconstitutional because only the Board has authority to promulgate such standards. Petitioners assert that the narrative criteria are really environmental control standards in disguise and, under this regulatory scheme, the Board has improperly delegated its statutory rulemaking authority to the Agency. Petitioners argue that the narrative criteria are numeric limitations which, once derived by the Agency, may be applied to more than one discharger.

Since "an administrative agency is a creature of statute, any power or authority claimed by it must find its source within the provisions of the statute by which it is created." (*Bio-Medical Laboratories, Inc. v. Trainor* (1977), 68 Ill. 2d 540, 551.) In *Landfill, Inc. v. Pollution Control Board* (1978), 74 Ill. 2d 541, this court stated:

"The Board, which was created by the Act [citation], serves both quasi-legislative and quasi-judicial functions within a statutorily established framework. *It must determine, define, and implement the environmental control standards and may adopt rules and regulations* [citation]. It has authority to conduct hearings upon, among other specified matters, complaints charging violations of the Act or of regulations thereunder and upon petitions for review of the Agency's denial of a permit as well as authority to hold other such hearings as may be provided by rule [citation]. It may adopt substantive regulations and procedural rules to accomplish the purposes of the Act [citation].

The Agency too was created by the Act [citation] and performs technical, licensing, and enforcement functions. It has the duty to collect and disseminate information, acquire technical data, and conduct experiments to carry out the purposes of the Act [citation]. It has the authority to conduct surveillance and inspection of actual or potential pollution sources [citation]. It has the duty to investi-

gate violations of the Act, regulations, and permits [citation]. The Agency must appear before the Board in hearings on the denial of permits, among other specified instances, and may appear in any other hearing under the Act [citation]. The Agency has the duty to administer permit systems established by the Act or regulations and has the authority to require permit applicants to submit plans and specifications and reports regarding actual or potential violations of the Act, regulations or permits [citation]." (Emphasis added.) (*Landfill, Inc.*, 74 Ill. 2d at 554.)

Under the Act, the Board is granted rulemaking authority to establish water quality standards by utilizing both substantive and procedural rules. (Ill. Rev. Stat. 1989, ch. 111½, pars. 1013(a)(1), 1026, 1027.) Also under the Act, the Agency is granted statutory authority to act as permit issuer and enforcer of violations of the Act, regulations, and permit conditions. (Ill. Rev. Stat. 1989, ch. 111½, par. 1004.) Essentially, petitioners' challenge of improper delegation of authority pertains to both the Board's authority to promulgate the narrative standard and subpart F as well as the Agency's authority to derive narrative criteria as the regulations so direct.

Clearly, there can be little doubt concerning the Board's rulemaking authority to promulgate these regulations. Under the Illinois Administrative Procedure Act, "rule" is defined as follows:

" 'Rule' means each agency statement of *general applicability* that implements, applies, interprets, or prescribes law or policy ***." (Emphasis added.) (Ill. Rev. Stat. 1989, ch. 127, par. 1003.09.)

Under the proposed regulations, the narrative standard, that there shall be no toxic substances in toxic amounts in Illinois waters, is a statement of general applicability which prescribes law and policy. It applies to all dischargers, all discharges, and all bodies of water within this State. The Board promulgated subpart F, like the

narrative standard, as a statement of general applicability which applies and implements law and policy. In this regard, subpart F plays a dual role. On the one hand, the Board has determined that the criteria-derivation process set forth in subpart F is an appropriate mechanism to provide substance and form to the Board's narrative standard, thereby enabling the Agency to enforce it. This is a matter within the Board's technical expertise and judgment, and we will not substitute our judgment for that of the Board. On the other hand, the procedures set forth in subpart F provide adequate guidelines which the Agency must follow in deriving narrative criteria. (See *Commonwealth Edison Co. v. Pollution Control Board* (1984), 127 Ill. App. 3d 446, 449.) Clearly, the Board has authority to promulgate regulations, such as subpart F, which provide directives to the Agency to enable that body to enforce the Board's narrative water quality standard. Both the narrative standard and subpart F were adopted through the proper statutory procedures, and petitioners do not challenge the regulations in this regard.

Petitioners, however, assert that in promulgating subpart F and the narrative criteria-derivation process, the Board has granted the Agency its statutory authority to set rules or water quality standards in the guise of narrative criteria. The resolution of petitioners' challenge to these regulations turns on whether the Board has delegated "rulemaking" authority to the Agency via the subpart F regulations. In considering the question of whether the derivation of the narrative criteria requires the use of rulemaking authority, we must determine whether the Agency-derived narrative criteria are standards of general applicability or "rules" within the meaning of the Administrative Procedure Act. This is so because, if the criteria are not "rules," then the Board has not delegated rulemaking authority to the Agency.

In our view, the criteria-derivation process set forth in subpart F cannot produce criteria that are "generally applicable." This is so because the procedures require the use of many pieces of data that are specific to the particular discharger. Even if any given criterion could properly be applied to other dischargers and withstand Board and judicial review, that class of dischargers would be very small indeed. There is, however, a more fundamental reason why a derived criterion *is not* a standard of general applicability: the opportunity for case-by-case review by the Board of both the *validity* of the criterion as well as its application to the particular discharger in question.

In contrast to criteria, under the Act interested parties are allowed to challenge the validity of a Board rule or regulation pursuant to section 41(a) of the Act (Ill. Rev. Stat. 1989, ch. 111½, par. 1041(a)). Section 41(a) provides that an interested party may obtain judicial review of the Board's regulation:

"by filing a petition for review within thirty-five days after entry of the order or other final action complained of *** directly in the Appellate Court ***." (Ill. Rev. Stat. 1989, ch. 111½, par. 1041(a).)

Review of Board regulations is also addressed in section 29 of the Act (Ill. Rev. Stat. 1989, ch. 111½, par. 1029). Section 29 provides for judicial review of the validity and application of a Board rule pursuant to section 41. (Ill. Rev. Stat. 1989, ch. 111½, par. 1029(a).) Section 29 further provides that, if judicial review of a Board regulation is not sought pursuant to section 41, neither the validity nor the application of the Board's regulation may be challenged in any subsequent proceeding under title VIII (enforcement actions), title IX (variance proceedings), or section 40 of the Act (permit appeals). (Ill. Rev. Stat. 1989, ch. 111½, par. 1029(b).) Thus, if a Board rule is not contested within 35 days of its promulgation, the

*validity* of that rule may not be challenged in any subsequent proceedings. The application of the rule, however, may be contested within 35 days after the Board's final order applying the rule to a discharger. (See Ill. Rev. Stat. 1989, ch. 111½, pars. 1029, 1041.) For example, if the Board promulgates numeric standards for certain toxics, as it has in the instant rulemaking, interested parties have, pursuant to sections 29 and 41 (a) of the Act, only 35 days in which to petition the appellate court for review of the *validity* of these numeric standards. (Ill. Rev. Stat. 1989, ch. 111½, pars. 1029, 1041(a).) Once this period elapses, parties cannot contest the propriety or validity of the numeric limit promulgated by the Board. This limit becomes a statewide standard and is, generally, applicable to all those who discharge into Illinois waters.

As stated, the validity of a Board standard can be challenged only within 35 days of its promulgation. This is not the case with Agency-derived criteria. In contrast to Board regulations, the *validity* and application of any Agency-derived criterion can be challenged *whenever* it is first applied to any discharger, whether that be in a permit appeal or an enforcement action. The opportunity for case-by-case review of the validity of the numeric limitation embodied in the derived criteria precludes the possibility that a criterion could constitute an environmental standard which would henceforth be generally applicable statewide. In this regard, the Board properly discerned the distinction between a rule and a criterion. In its order, the Board states:

"[A] criterion, as that word is used herein and even though it is a number derived by the Agency pursuant to the rules adopted by the Board in 302[,] Subpart F, cannot be considered to be a statement of general applicability. Criteria will be derived by the Agency in the course of the NPDES permitting and other site-specific situa-

tions, and applied on a case-by-case basis, taking into account the nature of the waterbody of interest. \*\*\*

Once a standard has been established by Board regulations, and it has withstood any appeals, the validity of that number itself cannot be subsequently challenged in a contested case setting. However, an Agency calculated criterion can. Because criteria numbers will be generated without the benefit of statewide public participation, and because application of the Subpart F procedures necessarily require the use of assumptions and professional judgment about which reasonable experts may disagree, the validity and correctness of application of a criterion must be reviewable by the Board on a case-by-case basis when the criterion is applied to a particular situation. Where the Agency believes that any criterion which it may derive in a particular case should appropriately be given statewide applicability, the Agency can and should propose pursuant to title VII of the Act addition of that criterion to the list of numeric water quality standards \*\*\*." Board Order, at 30.

Where the Board's construction of its regulations is a reasonable one, that construction is preferred and entitled to deference. (*Commonwealth Edison Co. v. Pollution Control Board* (1984), 127 Ill. App. 3d 446, 448, citing *People v. Nastasio* (1960), 19 Ill. 2d 524.) Since we find that the Board's construction of subpart F is a reasonable one, we adopt its construction and hold that the derived criteria are not "rules" within the meaning of the Administrative Procedure Act. We find that, rather than delegating rulemaking authority to the Agency as petitioners contend, subpart F provides directives and adequate standards to the Agency to guide it in the derivation process.

In addition, we conclude that the Agency has statutory authority to derive narrative criteria. In support of our conclusion, we note that the legislature has recently amended the Act to incorporate the Board's criterion-derivation concept. Subsequent amendments to the Act

"may be used to help determine the legislature's original intent [citation], particularly where the amendment is enacted shortly after the interpretation of the statute it amends comes into dispute [citation]." (*Central Illinois Public Service Co. v. Pollution Control Board* (1987), 116 Ill. 2d 397, 407; *People v. Rink* (1983), 97 Ill. 2d 533, 540.) The Act now defines criterion as:

> "the numerical concentration of one or more toxic substances *calculated by the Agency* as a basis for establishing a permit limitation or violation of a water quality standard pursuant to standards and procedures provided for in board regulations." (Emphasis added.) (Ill. Rev. Stat. 1991, ch. 111½, par. 1003.80.)

The amended Act further provides that if:

> "the Agency issues an NPDES permit that imposes limits which are based upon a criterion or denies a permit based upon application of a criterion, then the Agency shall have the burden of going forward with the basis for the derivation of those limits or criterion which were derived under the Board's rules." (Ill. Rev. Stat. 1991, ch. 111½, par. 1040(a)(1).)

In previously rejecting petitioners' argument, the appellate court properly determined:

> "What is significant about this is that in amending the statute as it did, the General Assembly did not deem it necessary to also include some express authorization allowing the Agency to derive and apply criteria. The only reasonable inference that can be made from this is that the General Assembly assumed that such power already existed and was proper at the time the regulations challenged here were promulgated." (221 Ill. App. 3d at 74.)

In light of the above, we too reject petitioners' challenge of improper delegation and uphold the Board's regulations pertaining to the narrative standard and subpart F. We find that these regulations do not delegate rulemaking authority to the Agency.

## 2. Mixing Regulations

Petitioners also lodge a challenge of improper delegation with respect to the Board's mixing regulations. Essentially, petitioners assert that the existence of a mixing zone or ZID alters the point at which dischargers must comply with the Board's water quality standards. Petitioners assert that the determination of where the Board's standards must be met is as important as the water quality standard itself. Petitioners also contend that the Agency has the sole and unbridled discretion in determining whether to grant a discharger a mixing zone or a ZID. Therefore, petitioners contend that, since the Agency's determination will control *where* a discharger must comply with the water quality standards, the Board has delegated rulemaking authority to the Agency.

We find petitioners' argument to be without merit. In the first instance, petitioners misunderstand the regulations' allowed-mixing concept. The Agency is not the sole "grantor" of the opportunity to utilize "allowed mixing." Under the regulations, dischargers can determine if they meet the requirements necessary for allowed mixing and, if so, can also determine the size and shape of the zone of mixing available to them. If charged with a violation, a discharger who utilizes allowed mixing outside the scope of the NPDES permitting process has the opportunity to prove that it is in compliance with the general mixing provisions as a defense to the charge. Under these circumstances, the Agency has nothing to do with the discharger's opportunity to use allowed mixing.

If a discharger would rather have a formally defined mixing zone as a condition in its NPDES permit, it may apply to the Agency for one during the permitting process. An Agency grant or denial of a mixing zone or ZID

is not a "statement of general applicability." It applies only to the particular permit applicant and certainly does not apply to dischargers statewide. Moreover, it is reviewable by the Board on a case-by-case basis when the Agency makes its determination and, therefore, as previously discussed, differs fundamentally from a Board regulation.

Nor does an Agency grant or denial of a mixing zone or ZID "determine, define, or implement" water quality standards. Rather, the Board's *mixing regulations* themselves define and implement its water quality standards. The Board has chosen mixing as a method of compliance for dischargers and its judgment will not be disturbed. The mixing regulations provide a framework for the use of mixing in Illinois waters. The Agency, as permit issuer and enforcer of the Board's regulations, has authority to make mixing determinations where the Board has provided for alternative methods of compliance. (See, *e.g., Commonwealth Edison Co.*, 127 Ill. App. 3d at 449.) The regulations provide directives to the Agency in making these determinations and limit its discretion in that, if a discharger can prove that the proposed mixing zone or ZID conform to the general mixing regulations, the Agency must grant the permit condition. The regulations further limit the Agency's discretion by providing for case-by-case review by the Board of the Agency's permit decisions. Therefore, since Agency mixing zone and ZID determinations are not rules of general applicability statewide and are reviewable on a case-by-case basis, we hold that the mixing regulations do not constitute an improper delegation of rulemaking authority to the Agency.

## C. TECHNICAL FEASIBILITY AND ECONOMIC REASONABLENESS

Petitioners also assert that the Board's rulemaking is invalid because the Board failed to consider the technical

feasibility and economic reasonableness of compliance with the proposed regulations, as it is statutorily required to do pursuant to section 27(a) of the Act (Ill. Rev. Stat. 1989, ch. 111½, par. 1027(a)). Petitioners contend that there is no evidence in the record concerning the technical feasibility and economic reasonableness of complying with the narrative criteria or the mixing regulations. Therefore, petitioners argue, the Board failed to promulgate these regulations in accordance with the Act.

Initially, we note that the Board's promulgation of the instant regulations is a quasi-legislative function and will not be disturbed unless the Board's action is clearly arbitrary, unreasonable or capricious. (*Central Illinois Public Service Co. v. Pollution Control Board* (1987), 116 Ill. 2d 397, 407; *Monsanto*, 67 Ill. 2d at 289.) When acting in its quasi-legislative capacity, the Board has no burden to support its conclusions with a given quantum of evidence. (*Shell Oil Co. v. Pollution Control Board* (1976), 37 Ill. App. 3d 264, 270-71.) Rather, the burden is on petitioners to establish the invalidity of the regulations.

As stated, the Board has authority to promulgate water quality standards applicable to all dischargers who discharge into Illinois waters. (Ill. Rev. Stat. 1989, ch. 111½, pars. 1005, 1013.) In promulgating regulations, the Board is governed by section 27 of the Act (Ill. Rev. Stat. 1989, ch. 111½, par. 1027). Section 27(a) of the Act provides:

"The Board may adopt substantive regulations as described in this Act. *** In promulgating regulations under this Act, the Board shall *take into account* the existing physical conditions, the character of the area involved, including the character of surrounding land uses, zoning classifications, the nature of the existing air quality, or receiving body of water, as the case may be, and the technical feasibility and economic reasonableness

of measuring or reducing the particular type of pollution. The *generality of this grant of authority* shall only be limited by the specifications of particular classes of regulations elsewhere in the Act." (Emphasis added.) Ill. Rev. Stat. 1989, ch. 111½, par. 1027(a).

In order to address petitioners' contentions, we must construe section 27(a) of the Act. In construing a statute, a court must ascertain and give effect to the legislature's intent. (*People v. Rink* (1983), 97 Ill. 2d 533, 539.) In order to do so, the court may consider the statutory language, the reason and necessity for the law, the evils to be remedied and the purpose to be obtained. (*People v. Haywood* (1987), 118 Ill. 2d 263, 271.) Unless otherwise defined, words used in the statute are to be given their plain, ordinary meaning. *General Motors Corp., Fisher Body Division v. Industrial Comm'n* (1975), 62 Ill. 2d 106, 112; *Shell Oil Co. v. Pollution Control Board* (1976), 37 Ill. App. 3d 264, 273.

The Act requires the Board to "take into account" several factors in promulgating regulations, specifically "the technical feasibility and economic reasonableness" of complying with the amended regulations. Petitioners argue that the Act requires the Board to make a determination, based on evidence in the record, that compliance with the proposed regulations is technically feasible and economically reasonable before promulgating them. Generally, the phrase " 'take into account' " means " 'allow for, make allowance for, weigh carefully, consider, take into consideration, bear in mind, remember, realize, appreciate, have in one's mind.' [Citation.]" (*Shell Oil Co.*, 37 Ill. App. 3d at 272.) Contrary to petitioners' contentions, under the plain meaning of the statutory language, the Board is only required to "consider" or "weigh carefully" the technical feasibility and economic reasonableness of compliance with proposed regulations in the rulemaking process.

Our conclusion is bolstered by the provision of the Act that requires courts to liberally construe its terms and provisions in order to achieve its stated purpose. (Ill. Rev. Stat. 1989, ch. 111½, par. 1002(c).) In this regard, the Act specifically provides:

"It is the purpose of this Act *** to establish a unified, statewide program supplemented by private remedies, *to restore, protect and enhance the quality of the environment,* and *to assure that adverse effects upon the environment are fully considered and borne by those who cause them."* (Emphasis added.) (Ill. Rev. Stat. 1989, ch. 111½, par. 1002(b).)

Pursuant to section 5(b) of the Act (Ill. Rev. Stat. 1989, ch. 111½, par. 1005(b)), the Board has authority to establish environment control standards and, in doing so, the Board must "take into account" the factors enumerated in section 27(a) and set forth above. Clearly, the authority granted to the Board is a general grant of very broad authority and encompasses that which is necessary to achieve the broad purposes of the Act. The factors set forth in section 27(a) which the Board must consider in promulgating regulations, including the technical feasibility and economic reasonableness of compliance, do not control the Board's authority to adopt a regulation. Rather than imposing a specific evidentiary burden on the Board, as petitioners contend, section 27(a) provides general standards to guide the Board in the exercise of its broad authority to ensure that the regulations adopted by the Board are reasonable.

Certainly, the Board's broad rulemaking authority is not limited by the extent of hardship that a regulation may cause to dischargers. The Board need not conclude that compliance with a proposed regulation is "technically feasible and economically reasonable" before it can adopt such regulation. (See *Monsanto,* 67 Ill. 2d at 292-93.) In fact, under certain circumstances, the Board can

promulgate standards which it has found to be techni-
cally infeasible. (*Monsanto*, 67 Ill. 2d at 292-93.) If the
Board, in its discretion and based on its technical exper-
tise, determines that a proposed regulation is necessary
to carry out the purpose of the Act, it may adopt tech-
nology-forcing standards which are beyond the reach of
existing technology. (*Monsanto*, 67 Ill. 2d at 293.) As this
court has stated:

> "[I]t is not necessarily arbitrary and capricious conduct
> for the Board to set a standard which a petitioner *cannot
> adhere to at the present time* or, if absolutely necessary to
> protect the public, *set a standard with which there can be
> no foreseeable compliance by petitioner.*" (Emphasis
> added.) (*Monsanto*, 67 Ill. 2d at 293.)

Indeed, the Act specifically provides for variance and ad-
justed standard procedures by which the Board may re-
lieve a discharger from compliance with its environmen-
tal control standards upon a showing of unreasonable
economic or individual hardship. See Ill. Rev. Stat. 1989,
ch. 111½, pars. 1035, 1028.1.

In light of the above, we conclude that section 27(a)
does not impose specific evidentiary requirements on the
Board, thereby limiting its authority to promulgate only
regulations that it has determined to be technically feasi-
ble and economically reasonable. Rather, section 27(a) re-
quires only that the Board consider or take into account
the factors set forth therein. The Board must then use
its technical expertise and judgment in balancing any
hardship that the regulations may cause to dischargers
against its statutorily mandated purpose and function of
protecting our environment and public health.

In the instant case, the Board did take into account
and considered evidence presented on the technical feasi-
bility and economic reasonableness of compliance with
the proposed regulations. In fact, the Board discussed
this issue in its final order and determined that compli-

ance with the regulations was technically feasible. In addition, the Board determined that the cost of compliance was economically reasonable when balanced against the benefits to be achieved by having subpart F in place in order to prevent, rather than react to, toxic pollution from, as yet, unidentified toxics. In this regard, the Board stated:

> "The Board is charged under the Act to take into account the technical feasibility and economic reasonableness of all regulatory proposals before it (Act at Section 27(a)). Compliance with the proposed regulations can be achieved with existing technology [citation]. Therefore, the substantive issue before the Board is solely whether implementation of the instant rule is economically reasonable.

> The Board has considered the various cost and benefit analyses presented in the record, as noted above. From this record it is reasonable to conclude that implementation of toxics control will have costs ranging upwards of several million dollars per year now and into the foreseeable future. Expected benefits include an improved aquatic environment and a benefit to human health through reduced presence of toxic substances in the human environment. Given this balance, the Board concludes that the instant rule will not be economically unreasonable." (Board Order, at 40.)

Clearly, the Board's determination that compliance is economically reasonable is a matter within its technical expertise and its discretion. We will not act as a super-agency and interfere with the Board's judgment in this area. Contrary to petitioners' assertions, we conclude that the Board did consider evidence concerning the technical feasibility and economic reasonableness of compliance with the instant regulations. In light of this, we cannot find that the Board's adoption of the amended regulations was arbitrary or capricious. On the contrary, we find that the Board's rulemaking is reasonable.

Therefore, we reject petitioners' challenge and uphold the instant regulations.

For the foregoing reasons, we affirm the appellate court.

*Affirmed.*

JUSTICES HARRISON and McMORROW took no part in the consideration or decision of this case.

CHIEF JUSTICE MILLER, dissenting:

I disagree with the majority's conclusion that the narrative standard provisions at issue in the present case do not constitute an improper delegation of rulemaking authority by the Pollution Control Board to the Environmental Protection Agency. Accordingly, I dissent.

Under the Illinois Environmental Protection Act, the Pollution Control Board is the administrative entity responsible for determining and promulgating, among other things, statewide water quality standards, which are at issue here. (Ill. Rev. Stat. 1989, ch. 111½, par. 1013(a)(1).) Proposed rules are subject to public comment and public hearing. (Ill. Rev. Stat. 1989, ch. 111½, par. 1028.) In addition, the Board must consider "the technical feasibility and economic reasonableness of measuring or reducing the particular type of pollution" involved in the substantive regulations it proposes to adopt. (Ill. Rev. Stat. 1989, ch. 111½, par. 1027(a).) In contrast, the Environmental Protection Agency is the entity charged with enforcing the substantive regulations adopted by the Board. (Ill. Rev. Stat. 1989, ch. 111½, par. 1004.) The Act does not confer on the Agency its own rulemaking authority.

The narrative standard provisions involved in this appeal grant to the Agency broad discretion in formulating and establishing the water quality standards that operators throughout Illinois must meet. To be sure, the new

system being adopted by the Board can claim a number of administrative conveniences. As the Board's order succinctly explains:

"The approach adopted here reduces the likelihood of outdated and outmoded standards by deferring formulation of the numeric standard until more of the pertinent information is available. At the same time, today's amendments allow the Agency to utilize the best currently available information to interpret the fundamental policy of 'no toxic substance in toxic amounts.' " *In re Amendments to Title 35, Subtitle C* (January 25, 1990), Ill. PCB Order No. R88—21, docket A, at 29.

I do not believe, however, that the Board has the statutory authority to adopt the streamlined regulatory model involved here. Rulemaking properly belongs to the Pollution Control Board, not to the Environmental Protection Agency, and the Board is not authorized to delegate that task to the Agency. The criteria to be formulated by the Agency in accordance with the procedures set forth in subpart F are, in my view, best characterized as agency standards of general applicability, and hence they must be deemed rules. (See Ill. Rev. Stat. 1989, ch. 127, par. 1003.09 (defining "rule" as an "agency statement of general applicability that implements, applies, interprets, or prescribes law or policy"); see also *Senn Park Nursing Center v. Miller* (1984), 104 Ill. 2d 169, 178-80.) In objecting to this aspect of the narrative standard provisions when they were first proposed by the Board, the Joint Committee on Administrative Rules noted, "It would seem logical that at least some of the criteria for toxicity developed by the Agency will have general applicability." (Joint Committee on Administrative Rules, January 10, 1990, Statement of Objection to Water Quality Standards, at 3; 13 Ill. Reg. 14172 (proposed September 15, 1989).) It would certainly seem to be the case that, once derived by the Agency, a

particular criterion will remain the same, at least until new scientific studies cause the Agency to revise the numeric standard it has previously determined. Thus, unless the Agency recalculates the relevant criteria in every enforcement or permit proceeding, the quantities formulated pursuant to the subpart F procedures will simply come to represent *de facto* water quality standards, effectively controlling Agency action whenever the Agency encounters chemical compounds for which criteria have already been established.

Moreover, the water quality standards will be formulated in the absence of the safeguards that generally inform administrative rulemaking by the Board. As the two dissenting members of the Board observed, the criteria will be established without the benefit of public hearing and public comment, and without any consideration of their economic reasonableness or technical feasibility—circumstances the Board is statutorily required to consider in its rulemaking. Ill. Rev. Stat. 1989, ch. 111½, par. 1027(a).

In support of today's decision, the majority suggests that the Agency-derived criteria should not be regarded as standards of general, or statewide, application, because operators may challenge them on review of Agency decisions. I am not persuaded, however, that Board review of Agency decisions is an adequate substitute for formal rulemaking by the Board. Again, unless specifically rejected by the Board, a criterion will remain in force, without being subject to the public comment that must accompany its formal rulemaking. Also lacking from the review process is any consideration of the economic reasonableness or technical feasibility of the water quality standard formulated under subpart F, factors the Board must normally consider in the adoption of substantive regulations. (See Ill. Rev. Stat. 1989, ch. 111½, par. 1027(a); *cf.* Ill. Rev. Stat. 1989, ch. 111½, par.

1033(c)(iv) (in making order and determination in enforcement proceeding, Board is to consider "the technical practicability and economic reasonableness of reducing or eliminating the emissions, discharges or deposits resulting from such pollution source").) Thus, although the review process might ameliorate certain aspects of the system adopted here by the Board, review cannot completely cure the defects that have been described.

Finally, I do not believe that the recent amendments to the Act answer the petitioners' objections to the narrative standard provisions. The Act now defines the term "criterion" (see Ill. Rev. Stat. 1991, ch. 111½, par. 1003.80) and, with regard to Board review of Agency permit decisions, places on the Agency the burden of establishing the basis for the criteria it has derived (see Ill. Rev. Stat. 1991, ch. 111½, par. 1040(a)(1)). Notwithstanding these new measures, the fundamental objections still remain; this partial statutory adoption of the criterion concept does not validate the Board's delegation of its rulemaking authority to the Agency.